In re AMBASSADOR RIVERSIDE IN-VESTMENT GROUP d/b/a Capitol House Hotel (EIN 72–1008826), Debtor.

AMBASSADOR RIVERSIDE INVEST-MENT GROUP d/b/a Capitol House Hotel, Blaine East, Robert Lueben, Joe B. D'Angelo, Ernest Hughes, Barbara Stine, Rick Dale, Patricia Nesbit, and Douglas A. East, Plaintiffs,

v.

David NAMER, Savings Investment Service Corp., and Financial Management Services, Inc., Defendants.

APEX, R.E. & T., INC.
(APEX), Plaintiff,

v.

SAVINGS INVESTMENT SERVICE CORPORATION, David Namer, and Financial Management Services, Inc., Defendants.

Bankruptcy No. 85–00158.
Adv. Nos. 85–0030, 85–0159.

United States Bankruptcy Court,
M.D. Louisiana.

April 28, 1986.

Margaret A. Shook and A.L. Blondeau, Baton Rouge, La., for Ambassador Riverside, et al.

William Ruhe, Dallas, Tex., for Lueben & D'Angelo.

Harvey H. Posner, Baton Rouge, La., for Star, Inc. of B.R. & Raymie Edmonds.

David S. Rubin, Carolyn Perry, and Mark Mese, Baton Rouge, La., for APEX.

Charles Schutte, Baton Rouge, La., for City Nat. Bank.

Joan B. Parmelee, Baton Rouge, La., trustee.

Victor L. Roy, III and Paul West, Baton Rouge, La., for SIS Corp. & CommNet.

## REASONS FOR JUDGMENT CONCERNING EQUITABLE SUBORDINATION OF FIRST MORTGAGE

WESLEY W. STEEN, Bankruptcy Judge.

### I. Jurisdiction of the Court

This is a proceeding arising under Title 11 U.S.C. The United States District Court for the Middle District of Louisiana has original jurisdiction pursuant to 28 U.S.C. § 1334(b). By Local Rule 29, under the authority of 28 U.S.C. § 157(a), the United States District Court for the Middle District of Louisiana referred all such cases to the Bankruptcy Judge for the district and ordered the Bankruptcy Judge to exercise all authority permitted by 28 U.S.C. § 157.

This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(K) and (O); pursuant to 28 U.S.C. § 157(b)(1), the Bankruptcy Judge for this district may hear and determine all core proceedings arising in a case under Title 11 referred under 28 U.S.C. § 157(a), and the Bankruptcy Judge may enter appropriate orders and judgments.

No party has objected to the exercise of jurisdiction by the Bankruptcy Judge. No party has filed a motion for discretionary abstention pursuant to 28 U.S.C. § 1334(c)(1) or pursuant to 11 U.S.C. § 305. No party filed a timely motion for mandatory abstention under 28 U.S.C. § 1334(c)(2). No party has filed a motion under 28 U.S.C. § 157(d) to withdraw all or part of the case or any proceeding thereunder, and the District Court has not done so on its own motion.

### II. The Facts

In this case more than most, the witnesses contradict each other, witnesses contradict documents, documents contradict other documents, documents are internally inconsistent, financial transactions cannot be reconciled or explained, and events are grossly confusing, at best. After weighing carefully many hours of courtroom testimony, numerous depositions submitted by stipulation, and a stack of documents about three feet thick, the Court concludes that these following facts are proved by a preponderance of the evidence, but no attempt is made to reconcile the conflicts in the evidence, since to do so would be interminable.

For several years Doug East ("East") has been a contractor in Dallas, Texas;

about 1982 he invested in a hotel venture in Dallas. In the fall of 1983, Equitex Investments, Inc. ("Equitex") asked East to go to Baton Rouge, Louisiana, to look at the Inn on the Lake, a hotel in financial trouble, and to determine whether the hotel could be acquired, renovated, and operated profitably.

While in Baton Rouge, East met John Fels ("Fels"), a hotel acquisition and operation consultant, who convinced East to purchase the Capitol House Hotel instead of the Inn on the Lake. The Capitol House was then owned by APEX, R.E. & T., Inc. ("APEX"), which had acquired the Capitol House as part of the assets of a defunct REIT. After about $500,000 of improvements and after substantial changes in the hotel's management, the Capitol House had become a marginally profitable business for APEX.

On January 13, 1984, East (on behalf of Great Texas Development ["GTD"])[1] agreed to buy the hotel from APEX for $5 million, cash. Of this sum, APEX agreed to pay a $500,000 "commission" to Equitex and a commission of $90,000 to Fels. The agreement provided for a March 20, 1984, closing, but also provided for East's right to extend the closing date by 30 days for an additional fee.

East planned to finance the project through Mark Solomon ("Solomon") of Evangeline Savings & Loan in Lafayette, Louisiana; Solomon had financed the Dallas hotel. In late January, 1984, however, Solomon informed East that Evangeline could not finance the Capitol House acquisition and renovation because the total loans from Evangeline to East (and East affiliates) would then exceed regulatory limits applicable to Evangeline's loans to a single borrower.

In early February, 1984, Solomon introduced East to David Namer ("Namer"), whom Solomon had met at a loan broker's convention. East provided Namer with preliminary data about himself and the project. At a second meeting in Baton Rouge about March 5, 1984, Namer "walked" the property with East and Solomon. In a letter dated March 8, 1984, Namer "offered" East both an acquisition/renovation loan and a take-out commitment. The letter indicated that the loan could be closed in about 45 days, contingent on East's satisfying Namer on four issues: (i) "a pro-forma for the next three years"; (ii) a feasibility study, (iii) an appraisal and detailed construction cost breakdown, and (iv) details about treatment of the bathroom area as well as the overall size of each of the individual sleeping units necessary to bring the old hotel up to modern standards, particularly with a view to hotel franchise requirements. The letter does not specify any objective criteria to be met to satisfy Namer regarding these four issues; the letter states that the "acquisition and renovation loan" will be made if "the above required supporting documentation is reviewed to our satisfaction." The loan structure proposed in the March 8 letter is bifurcated: (i) an initial acquisition/renovation loan, and (ii) a "take out commitment." The letter then states twice on the second page that the acquisition and renovation loan would not be made unless a take-out commitment were in hand before closing the renovation/acquisition loan; as if that were not enough, the requirement is stated still a third time on the third page.

Namer wrote the March 8 letter as President of his corporation, Financial Management Services, Inc. ("FMS"); that corporation purported to be an independent loan broker, but it appears that its sole source of loans was the defendant Savings Investment Service Corp. ("SISCORP"), an Oklahoma savings and loan service corporation. It also appears that Namer and FMS were the exclusive agents for SISCORP in the United States, except for the State of Oklahoma. Indeed, throughout trial it appeared (and SISCORP counsel in post-trial rebuttal memorandum has conceded) that Namer/FMS spoke authoritatively for SIS-

---

1. The parties were not very careful about defining the entities involved. There was confusion of rights and transfers of rights between East, GTD, and Ambassador Riverside, the Debtor.

CORP.[2] In the documentary evidence, and in testimony, Namer regularly confused his role as loan broker for his client and his role as agent for SISCORP; both sets of evidence indicate that when he made offers, he was speaking authoritatively, and without limit, for SISCORP. East paid Namer $30,000 to act as his broker.

On April 19, 1984, the agreement to buy and to sell the Capitol House was amended: (i) to extend the closing date to April 30, 1984; (ii) to provide for two additional extensions (with provision for extension fees) the last of which expired on May 23, 1984; (iii) to substitute the Debtor, Ambassador Riverside Investment Group ("Ambassador Riverside" or "Debtor"), for GTD as the purchaser's assign; and (iv) to decrease the amount of commission due Equitex by APEX.

The confusion of the events prior to April 20 pales by comparison with the cacophonous evidence of the events following that date. Few, if any, of the documents appear to reflect accurately the events; the witnesses contradict each other; the attorneys who prepared closing sheets cannot explain how loan proceeds were disbursed and why. The entire loan process, from start to finish, is unexplained and apparently unexplainable. These following conclusions about the loan process, therefore, rely more than usual on determination of witness credibility; of particular emphasis in that regard, the Court notes that Namer inspired in this Court virtually no confidence in his credibility.

Namer always intended to place the loan through SISCORP; that entity, however, merely generated loans and serviced them; the funding for the loan would be obtained by selling loan participations, a function that Namer intended to serve for SISCORP and a function for which he apparently would be compensated. Some time before May 11, 1984, Namer prepared a loan book; it contained a cover letter seeking loan participation, a loan summary and *pro forma*, an MAI appraisal, a resume of Hotel Management Group, a Market Study, finan-

cial statements of Ambassador Riverside and its affiliates, a $6,000,000 loan commitment form, and a draw request. That documentation was sent, on May 11, to several financial institutions that Namer suspected might be willing to participate in the loan. Among the financial institutions to whom Namer sent the request was City National Bank ("CNB") of Baton Rouge. In the communication to CNB, Namer indicated clearly and intentionally that SISCORP had committed to make an acquisition/renovation loan and a permanent take-out loan.

The solicitation was unsuccessful. It became apparent that the loan was not attractive at a 70% loan-to-MAI value ratio. It also became clear that Namer could not raise any funding for the loan as it was structured and that SISCORP could not fund the loan if Namer could not find financial institutions willing to purchase loan participations.

At Namer's suggestion and through his negotiations, the deal was restructured so that APEX was to take a second mortgage; this lowered the loan-to-value ratio substantially. In addition, it reduced the total cash needed for the SISCORP mortgage. Despite Namer's testimony to the contrary, it is clear that Namer represented to all concerned that there would be a renovation loan through SISCORP in 180 days to provide cash with which to pay the initial loan and to pay for substantial renovations.

The keystone of the SISCORP/Namer/FMS case is the argument that there was never a legal commitment to a renovation loan and that the March 8 commitment letter was negated by subsequent events. The Court concludes that there is insubstantial evidence that the March 8 offer was withdrawn and that, if it was withdrawn, SISCORP/Namer/FMS acted as if it were still effective and intentionally led APEX, the Debtor, CNB, and Star to believe that it was still effective. Based on a thorough review of all the evidence, the Court concludes that it is highly improbable that Namer gave any indication that the

**2.** p. 10 of SISCORP/Namer/FMS post-trial re-    buttal memorandum.

March 8 "offer" was withdrawn or that all requirements of that offer had not either been fully met, considered substantially and sufficiently satisfied, or actually waived. The clear preponderance of the evidence is that SISCORP/Namer/FMS intentionally led the other parties to believe that the 180 day "bullet" loan that was actually made was merely an initial step to get to the acquisition/renovation loan to which Namer had committed himself, FMS, and SISCORP on March 8.

At trial and in memoranda, SISCORP/Namer/FMS made great pother about the alleged failures of East/Ambassador to comply with the requirements for the loan commitment. They point emphatically to the absence of a written permanent loan commitment and East's alleged failures to provide requisite loan documentation. These contentions have little substance for three reasons. First, they seem more retrospective excuses than contemporaneous reasons. Second, when taken in the context of the entire case, the lack of documentation is not surprising; the entire documentation surrounding this loan transaction is abysmal. The March 8 loan offer clearly contemplated that the same loan commitment requirements would apply to initial funding and to final renovation/mini-permanent funding. Since the initial loan was funded, absent indication to the contrary, one would expect that the identical requirements for the final funding were also met and that final funding would follow. Third, from the evidence produced at trial, it appears that the four requirements of the March 8 offer were substantially met for the initial funding; if so, then all requirements were in fact met for the final loan. If the requirements were not met for the initial loan, then it appears that they were waived; if they were waived for the initial loan, the logical conclusion (especially absent any contrary evidence) is that they were waived for the final loan.

SISCORP/Namer/FMS assert that the March 8 letter was never accepted in writing, and that final documentation was never executed to commit SISCORP to lend to the Debtor. This appears to be true, but not the whole truth. The final documentation on the initial loan (the one that was actually made) was also irregular; among other things, the "commitment" to do so was signed on the same day that the loan was made. Given the irregularity in all the documentation and procedures in this case, including particularly the loan that *did* take place, the Court finds little evidentiary value in the irregularity of the documentation for the loan that was not made.

The loan closed on May 24, 1984, in Edmond, Oklahoma. Although Ambassador Riverside Investment Group signed a mortgage, it did not then own the property; the sale of the property closed May 25, 1984. But, apparently to the surprise and dismay of everyone except SISCORP/Namer/FMS, no funds were disbursed until at least June 1, 1984, slightly more than a week later. Even then, only $2.7 million was disbursed; the balance was not disbursed until about July 6, 1984, almost six weeks later. The final disbursement, to FMS, was August 24, 1984, three months after the loan closing. SISCORP simply did not have the funds to close the loan it signed; SISCORP forwarded funds to the closing attorney in Baton Rouge as it was able to raise them. In fact, SISCORP had no firm commitment for loan participation on May 24, 1986, and was only beginning (through Namer/FMS) on that date to seek participants.

Although they both attended the Edmond, Oklahoma, loan closing, Solomon (who expected a "finder's fee" of about $20,000 for Evangeline Federal Savings & Loan) and Harry Mosgrove ("Mosgrove," who attended to get APEX's money) left empty-handed. When the sale closed in Baton Rouge, Louisiana, on the following day, all parties again left empty-handed. Namer/SISCORP explained that there was a breakdown in the "federal wire" transfer system, but in fact it was clear that SISCORP had no cash with which to fund the loan. In dribbles over the next few months, the loan was funded.

What happened between May and October is less specific. Apparently East oper-

ated the hotel and tried to renovate it without funds, expecting to get a construction loan from SISCORP at any time, but looking elsewhere for financing as his confidence in SISCORP/Namer/FMS waned. APEX spent most of the next few months on the telephone: first trying to get the sale proceeds paid from the closing attorney (who had not received the funds from SISCORP) and then trying to get assurances from SISCORP/Namer/FMS that the take-out commitment would indeed be funded prior to the end of November (180 days after the May closing). SISCORP/Namer/FMS were scrambling to fund the loan they had closed but not funded; they were trying to sell loan participations to financial institutions. Apparently Namer also became nervous about East's financial strength and, therefore, unilaterally imposed additional loan requirements on East by requiring East to sign the document dated July 2, 1984,[3] using as an excuse the argument that these requirements were necessary to the funding of the loan that had already been closed.

From October, 1984, through January, 1985, confusion reigned supreme. On October 2, 1984, SISCORP wrote to East requesting information that East says he had already provided; the sense of the October 2 letter is that the requirements for full funding of the construction loan were met if those documents were supplied. Three days later, another officer of SISCORP wrote East indicating that East had defaulted on the loan and that payoff would be required upon maturity (but apparently not before).

In fact, no permanent or construction financing materialized. Nevertheless, for some unexplained reason, SISCORP did not give written notice of default or attempt to foreclose. In early January, 1985, Namer received a check from East dated December 21, 1984, in the amount of $64,745.80 for an extension of the loan. Payment amounts were also calculated for additional extensions, but it is unclear how far the

extensions were to go, or indeed whether SISCORP had committed to *any* other extensions. These issues are yet another example of the absence of clearly defined rights, obligations, and documentation. East testified that in addition to these sums, he paid Namer (through FMS) an additional $10,000 for the extension and that these payments were to carry the loan current through the end of January; the thrust of East's testimony is that SISCORP/Namer/FMS was still holding out the expectation of a take-out/renovation loan. Other than an unsigned, confusing payoff per diem computation (that does not directly confirm any of these figures), no documentation was produced concerning the extension except the check.

On February 11, 1985, Ambassador Riverside filed a voluntary Chapter 11 petition.

Star, Inc., ("Star") is a Baton Rouge heating, air conditioning, *etc.* (HVAC), contractor. On July 2, 1984, Star began work on the hotel. The work consisted of emergency work to a boiler to make the hotel safe and additional HVAC work. Plans for complete HVAC renovation were made and a bid was given; the complete renovation was to be paid by the SISCORP renovation loan. Work continued until February, 1985. The sum due Star for this work is $450,046.03.

Raymie Edmonds ("Edmonds") is a Baton Rouge architect. He prepared preliminary sketches and plans to renovate the hotel; the sketches and plans were necessary to the renovation loan process and necessary to renovate the hotel. The sum due Edmonds is $6,806.61.

CNB lent $175,000 to the Debtor. These funds were used to do preliminary renovation to the hotel. The loan was intended as a short term loan to be repaid from the SISCORP renovation loan that Namer had led CNB to believe was forthcoming.

### III. The Law

Some statutory language is so specific and complex that interpretation is virtually

---

**3.** APEX Exhibit # 107.

impossible. The law of equitable subordination is at the other extreme.

11 U.S.C. § 510(c) provides that "... the court may—under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim ... or ... order that any lien securing such a subordinated claim be transferred to the estate." With such a straightforward reference, one might think that the "principles of equitable subordination" was a well established, clearly defined, immutable doctrine: not so. With this provision, Congress both approved the existing jurisprudence on the subject and encouraged additional development.

"It is intended that the term 'principles of equitable subordination' follow existing case law and leave to the courts development of this principle." *Congressional Record*, Senate, S17412, October 6, 1978.

The existing jurisprudence is highly fact-specific, but there are three leading cases, all of which are binding on this Court: *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed.2d 281 (1939); *In the Matter of Mobile Steel*, 563 F.2d 692 (5th Cir., 1977); *In the Matter of Multiponics, Incorporated*, 622 F.2d 709 (5th Cir., 1980). The first two existed when the statute and cited legislative history were written; the last is an embellishment of the second. The test announced by the 5th Circuit has been often cited:

"(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankruptcy or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." *Multiponics*, 622 F.2d 709, 713.

The three cited cases involved a breach of fiduciary duties. Each emphasizes that a fiduciary enjoys a special relationship, and each emphasizes the careful scrutiny to which his conduct will be exposed.

■ Was SISCORP a fiduciary? Not every lender is a fiduciary: *In the Matter of W.T. Grant*, 699 F.2d 599, 609 (2d Cir.,1983). The dual relationship of Namer as agent for the Debtor and his contemporaneous status as not fully disclosed agent of SISCORP put this case in a different posture from a simple borrower/lender relationship. Even if SISCORP were merely a lender, it is incorrect to conclude that equitable subordination is appropriate only when the defendant is a fiduciary.[4]

■ It is clear that Namer/FMS undertook an engagement to serve as East's agent, his loan broker. Namer did not then clearly disclose that he and FMS were exclusively authorized to act and acting exclusively and without limit for SISCORP anywhere in the United States except Oklahoma. When East paid $30,000 to Namer about February of 1984, Namer agreed on East's/Debtor's behalf to attempt to provide East with a construction loan and a take-out loan; this engagement at least entailed duties of fairness to East/Debtor.

In fact, Namer was serving another master: Namer was acting as a "division" of the other party to the transaction (SISCORP) and gave substantial allegiance there. Namer also had substantial self-interests beyond earning his loan brokerage fee from the borrower; he also earned fees for selling participations in the loan. Namer also had substantial allegiance to SISCORP to assure that the SISCORP relationship continued.

■ From all the evidence available, this Court concludes that in the course of the transaction Namer intentionally misled his client (Ambassador/East), APEX, all prospective loan participants, City National Bank, and Star (by information transmitted through CNB) to believe that a take-

---

4. For an outstanding discussion of the doctrine of equitable subordination applicable to creditors who are not fiduciaries, see DeNatale and Abram, "The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors", 46 *Bus.Law* 417 (1985).

out/renovation loan was forthcoming. By doing so, it appears that Namer was the operative factor that resulted in the sale of the hotel from APEX to East and the consequent building improvements for which payment was never made. While SISCORP/Namer/FMS assert that the reason for failure to fund the take-out/renovation loan was East's failure to comply with the loan commitment requirements, this Court concludes from the evidence that the actual reason was the inability of SISCORP/Namer/FMS to obtain the cash necessary to fund the loan.

Namer clearly breached his fiduciary obligation to East. Since Namer was operating as a division of SISCORP, such misconduct taints the claim held by SISCORP. Acting through Namer, SISCORP misled virtually every other party involved in this proceeding; they were misled to conclude that an $18 million construction loan and a take-out loan were imminent. Finally, Namer/SISCORP knowingly continued these deceptions far beyond the stage when substantial harm could have been avoided. Such conduct absolutely shocks the conscience.

■ The second requirement for equitable subordination is that there be harm to creditors or benefit to the defendant; there is both in this case. In addition, the harm must be caused by the inequitable conduct.

There is harm. Before the closing, APEX owned a $5 million hotel; subsequent to the closing, it had $3.2 million and a second mortgage behind a $4 million SISCORP first mortgage. That is harm indeed. Before the transaction, the Debtor and the hotel owners owed Star, Edmonds, and CNB no money; afterwards, these creditors hold claims totaling almost $750,-000. These claims appear to be worthless if the first mortgage stands. That is harm indeed. Finally, but for SISCORP's conduct, the trustee and numerous administrative claimants would not have apparently worthless claims in this proceeding. They have indeed suffered harm.

There is benefit to the Defendant. SISCORP finds itself holding a $4 million first mortgage on a hotel and *de facto* owner if the mortgage stands. Its total expenditure was $3.2 million. That may or may not be an advantage, depending on the ultimate value of the hotel. In any event, SISCORP's security has been improved because its continued deception resulted in efforts to preserve and to improve its collateral by Star, Edmonds, and the administrative expenses related to preservation of the security during the bankruptcy proceeding. SISCORP has benefited from the inequitable conduct that constituted the continued deception.

Causation is clearly established. There is no real dispute that the hotel sale would not have occurred, that the second mortgage would not have come into existence, that the unsecured creditors would not have lent money, and that the bankruptcy case would not have existed if SISCORP had not, by providing the initial loan, caused the Debtor to be formed and the hotel sale to occur. It also appears that Star, Edmonds, and CNB would not have lent money and provided services if SISCORP had not misled them to believe that a renovation/take-out loan was forthcoming. It appears that APEX would not have taken a second mortgage if SISCORP had not misled them into believing a renovation/take-out loan was forthcoming.

The final element is that subordination must be in harmony with the Bankruptcy Act. Judge Brown's words in *Multiponics* are cogent not only to explain the test, but also to explain why subordination in the case at bar meets the test:

"... bankruptcy courts are courts of equity ... guided by the principle of equality of distribution ... but, at the same time, authorized to prevent courses of conduct otherwise fraudulent, abusive or unfair ... (the equitable powers of the bankruptcy court 'have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done') ...

('the Courts will be guided by cardinal principles of equity jurisprudence to the end that injustice or unfairness is not done in the administration of the bankrupt estate.') As one commentator has suggested, particularly where a holistic picture of inequitable dealing is present, equitable subordination serves a useful function in bankruptcy administration." *Multiponics*, 622 F.2d 709, 721.

The thrust of SISCORP's memoranda in this case is: (1) SISCORP never committed to make a take-out commitment, and, therefore, should not be penalized for not providing a take-out loan; (2) SISCORP was not guilty of such fraud as to make it responsible for damages incurred by the other parties who are mature and knowledgable businessmen bound by their own mistakes; and (3) APEX and the Debtor were guilty of inequitable conduct; the SISCORP claim should not be subordinated because the Complainant does not have clean hands.

SISCORP's argument misses the thrust of equitable subordination principles. The issue in this case is *not* whether SISCORP is liable for failure to make a renovation/take-out loan. The issue is whether SISCORP's conduct was so inequitable as to justify the subordination of its claim. The fact is that SISCORP convinced all other participants that a renovation/mini-permanent loan was forthcoming. It did so through a deceptive practice involving an apparently independent "broker", in name acting for the borrower, but in fact operating as a division of the lender.

■ Bankruptcy cases almost always begin with an entity in dire financial straits. It is virtually always true that there are insufficient assets to satisfy all legitimate claims. Equitable subordination, then, does not deal with a judgment for damages or a judgment requiring one party to make another whole; this is not an action for damages or to rescind a contract for fraud. Equitable subordination is concerned with not allowing those who have participated in inequitable conduct to participate in dividing insufficient assets.

SISCORP's arguments regarding the Debtor's alleged misconduct are completely inapposite. Under no circumstances will the SISCORP claim be subordinated to the equity interests. The Debtor here acted as Trustee for the unsecured/administrative creditors until a trustee was appointed who has continued the proceeding. SISCORP's arguments about APEX's alleged misconduct is premature. Insufficient (if any) APEX misconduct was shown at trial to deny subordination of the SISCORP claim to the APEX claim; a full trial on subordination of APEX's claim is scheduled for later.

### IV. Conclusion

For these reasons, the lien held by SISCORP/COMNET will be transferred to the estate. SISCORP contends that APEX has been involved in inequitable conduct as well. The Debtor has brought an equitable subordination complaint against APEX. Whether that lien will be transferred to the estate is yet to be determined. Since SISCORP's interests may vitally be affected by the outcome of that proceeding, the Court will consider a motion by SISCORP to intervene to assert rights provided under 11 U.S.C. § 1109.