In re CENTRAL PACIFIC BOILER & PIPING, LTD., a Hawaii corporation, Debtor.

S & M SAKAMOTO, INC., Plaintiff,

v.

Ralph S. AOKI, Trustee for Central Pacific Boiler and Piping, Ltd., et al., Defendants,

and

Boilermaker–Blacksmith National Pension Trust, et al., Intervenors.

FIRST HAWAIIAN BANK, Plaintiff,

v.

Edward P. ANDERSON, et al., Defendants,

and

Boilermaker–Blacksmith National Pension Trust, et al., Intervenors.

Bankruptcy No. 84–00166.
Adv. No. 86–0079.

United States Bankruptcy Court, D. Hawaii.

Nov. 6, 1987.

funds being accounts receivable of Central Pacific Boiler & Piping, Ltd. ("Debtor") for prepetition work performed for Sakamoto.

The principals of debtor corporation, Edward A. Anderson and Alzada P. Anderson ("Andersons"), claim the funds as individuals and subrogees of Bank's secured interest in the funds; Boilermaker–Blacksmith National Pension Trust, the Boilermakers' Union, Lodge 204, and associated trust funds ("Intervenors"), claim the funds on behalf of the estate in bankruptcy. Trial on the matter was held on September 14, 1987, at which time Charles K.Y. Khim, Esq., appeared on behalf of Intervenors and William J. Wynhoff, Esq., represented the Andersons. Neither the Trustee in Bankruptcy nor any other creditor of the estate or claimant to the funds appeared at trial.

Based upon the memoranda filed and the records herein, the testimony of witnesses and arguments of counsel, the Court enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. At all times relevant herein, Debtor was a close corporation, organized in Hawaii and engaged in the business of performing construction work in the heating, boiler and piping fields. From 1975 and thereafter, the Andersons held a total of 99.40% of the outstanding stock of Debtor, each individual holding 49.70% of that stock. The balance of the shares were owned by the Andersons' daughter. From 1973 and thereafter, Edward Anderson was the President and Chief Executive Officer of Debtor.

2. Debtor had maintained a line of credit with the Bank since at least 1961; at all times relevant herein, Debtor could borrow up to $800,000 on this line of credit. At all times relevant herein, obligations arising through the line of credit were personally guaranteed by the Andersons, secured by perfected mortgages on a warehouse property and a residence owned personally by the Andersons, and further secured by a duly perfected security agreement covering

William J. Wynhoff, Honolulu, Hawaii, for plaintiff.

Charles K.Y. Khim, Honolulu, Hawaii, for defendants.

JON J. CHINEN, Bankruptcy Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

First Hawaiian Bank ("Bank") and S & M Sakamoto, Inc. ("Sakamoto"), each filed interpleader complaints as adversary actions on May 7, 1986, and October 17, 1986, respectively. The complaints sought to have the Court determine the proper disposition of funds held by each party, said

all furniture, fixtures, equipment and accounts of Debtor.

3. In 1979, Debtor entered into a joint venture agreement with Greenstone Development Co. ("Greenstone"), forming a partnership for the purpose of bidding on a large contract for the replacement of certain boilers at the Pearl Harbor Naval Shipyard ("Harbor project"). Without the participation of Greenstone, Debtor did not have the bonding capacity to bid on the Harbor project. The Harbor project was eventually awarded to an entity called Bumstead–Woolford, but the joint venture obtained a significant portion of the work through a subcontract with Bumstead–Woolford. Venture capital of $300,000.00 was necessary to begin work on the subcontract; Debtor provided $200,000.00 and Greenstone provided $100,000.00. Debtor and Greenstone were each entitled to a share of the profits resulting from the joint venture's participation in the Harbor project in proportion to the amount each initially contributed to the joint venture.

4. Debtor made the majority of the cash advances to the joint venture to cover ongoing expenses incurred during work on the Harbor project. In addition to the original capital investment and in response to a request from Edward Anderson, Greenstone contributed an additional $100,000.00 to the partnership to try to help alleviate the financial difficulties occasioned by substantial disputes which arose between Bumstead–Woolford and the joint venture. After the subcontract was completed, the joint venture claimed that it was owed $1,300,000.00. The claim was arbitrated and an award of $300,000.00 was made in or about June of 1983. Approximately $150,000.00 of the award went to pay the fees and costs of the arbitration.

5. As a result of the meager net proceeds of the arbitration award, the partnership sustained losses of over $1,000,000.00, and Debtor sustained the brunt of this loss due to the large amount of cash advances made during work on the Harbor project. The loss caused Debtor to file a Chapter 11 bankruptcy petition on April 4, 1984, subsequently converting to a Chapter 7 proceeding on December 28, 1984.

6. Meanwhile, during the winter of 1980–81, the Andersons sought to obtain an interest in a limited partnership named Orchid Isle Group ("Orchid Isle"), an entity involved in real estate development. The sole shareholder and chief executive officer of the general partner of Orchid Isle was Robert Bjerke, a personal friend of the Andersons. The Andersons obtained a 2½% interest in the limited partnership by lending $220,000.00 to Orchid Isle. No additional consideration was required to obtain the interest. The fair market value of the interest was estimated to be $220,000.00.

7. To lend the $220,000.00 to Orchid Isle, the Andersons borrowed money from Debtor, which in turn borrowed the funds from the Bank pursuant to Debtor's line of credit. The Andersons had attempted to borrow the money directly from the Bank, but were unable to do so because their personal credit was pledged on the line of credit. Disinterested persons at Debtor, including the Treasurer, Daniel Tamura, were aware of the Andersons' personal borrowing on the line of credit, and the borrowed amounts appeared on the financial statements of Debtor.

8. The Andersons expected Orchid Isle to repay the loan on or before July 1, 1981, by which time funding for Orchid Isle's Prince Kuhio Shopping Mall was to have been received from other sources. It was the Andersons' intent to repay the loan from Debtor at that time. The only promissory note introduced into evidence which dealt with the debt owed to Debtor by the Andersons was dated April 30, 1983, approximately two years after the funds were obtained. That promissory note did not provide a rate of interest payable or a due date for payment of the note.

9. As it turned out, Orchid Isle was not able to repay the loan to the Andersons until September of 1983. Between that time and February of 1984, the Andersons received $314,886.00 from Orchid Isle, of which amount $72,886.00 was interest.

10. Between September of 1983 and October of 1984, the Andersons paid $344,995.00 to Debtor, which amount included the principal amount of $220,000.00, plus interest at the same rate charged to Debtor by the Bank, or "prime plus two". The resulting interest payment of approximately $125,000.00 is consistent with the figures listed on the financial statements of Debtor filed with the Bankruptcy Court which show interest income of approximately $92,000.00 in 1982, and approximately $34,000.00 in 1983. Debtor reported income on an accrual basis.

11. At no time was Debtor prevented from drawing further on the line of credit with the Bank because of the Andersons' personal borrowing. Debtor's line of credit at the Bank reached the limit of $800,000.00 on July 8, 1983. As of that date, the arbitration had been concluded, the loss in excess of $1,000,000.00 had been sustained, and the only hope for survival was the possibility of obtaining a large contract for a continuous process ethanol plant. When that deal eventually fell through, Debtor was left with no option but to file its bankruptcy petition.

12. As of October 31, 1983, the total amount owed to the Bank on the line of credit was $851,950.00. On that date, the Andersons paid $100,000.00 to Debtor which in turn paid that amount to the Bank to reduce the indebtedness.

13. To further reduce the debt to the Bank, about September of 1984, the Andersons sold the warehouse property which they personally owned, resulting in a payment of approximately $300,000.00 to the Bank. A second mortgage of $125,000.00 was taken back as part of the sale of the warehouse, and that second mortgage was assigned to the Bank as security for the line of credit. The Andersons then sold their personal residence by Agreement of Sale in November of 1984, paying the Bank approximately $240,000.00 from the down-payment and assigning the Agreement of Sale to the Bank as further security for the line of credit. As a result of these payments, as well as direct payments from Debtor, the principal balance of the line of credit was reduced to $210,000.00. This amount was paid in full by the Andersons by a further payment of $100,000.00 on the Agreement of Sale and payment of the second mortgage from the sale of the warehouse.

14. In consideration of the full payment by the Andersons of the amount owed on the line of credit, the Bank executed and delivered a duly perfected Assignment of Security Agreement, assigning to the Andersons the security agreement covering all furniture, fixtures, equipment, and accounts of Debtor.

15. In 1984, Debtor completed a subcontract with Sakamoto, but Sakamoto retained certain sums owed to Debtor until a two-year guaranty under the subcontract elapsed. Edward Anderson personally performed certain necessary work under the subcontract because Debtor was already defunct. The amounts retained by Sakamoto (the "Sakamoto proceeds") were covered under the terms of the security agreement assigned to Debtor by the Bank. Sakamoto paid approximately $40,000 to the Bank after the two-year guaranty elapsed, and just several days after the line of credit was fully satisfied, in the mistaken belief that the Bank was still the proper recipient of the Sakamoto proceeds. Sakamoto itself retained approximately $8,000.00 of the funds.

16. Neither the Bank nor Sakamoto claims the funds for itself; rather, each has alleged in separate interpleader actions that the Sakamoto proceeds were subject to conflicting demands asserted by the Andersons, First Insurance Company of Hawaii, Ltd. ("First Insurance"), and the Trustee in Bankruptcy. This Court ordered that the Sakamoto proceeds, less attorneys' fees and costs, be deposited with the Trustee and placed in an interest-bearing account until further orders of the Court. The two interpleader actions were consolidated in April of 1987.

17. First Insurance filed a pleading on March 2, 1987, indicating that it did not oppose the payment of the deposited funds to the Andersons. First Insurance did not appear at trial. Intervenors, on the other

44

hand, claim to be priority creditors of the bankruptcy estate and were allowed to intervene in the consolidated cases. The Intervenors request that the interpleaded funds be made part of the bankruptcy estate.

18. From September of 1983 to the time of trial, the Andersons paid to or on behalf of Debtor, over $1,200,000.00, at least $750,000.00 of which was paid to the Bank pursuant to the personal guarantee of the line of credit. In addition, the Andersons remain personally liable for approximately $70,000.00 on a bond account owed to First Insurance, and approximately $30,000.00 in state taxes. Debtor was or is primarily liable on each of these debts.

19. The Bank is duly listed as a secured creditor on the schedules filed by Debtor in its bankruptcy proceeding. Intervenors have conceded that, pursuant to 11 U.S.C. § 509(a), the Andersons have a subrogated right to the Bank's interest in the Sakamoto proceeds, to the extent of the payments made to the Bank on behalf of Debtor. Thus, the only issue for determination in this action is whether that right must be "equitably subordinated" to the interest of the Trustee in Bankruptcy pursuant to 11 U.S.C. § 510(c).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of these consolidated cases as a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This Court also has jurisdiction over all the parties to this proceeding.

2. The Security Agreement originally held by the Bank was a valid, perfected first lien on the Sakamoto proceeds and gave the Bank a priority claim to those proceeds superior to the claims of Debtor and any other creditor. The Assignment of the security agreement from the Bank to the Andersons was duly perfected and is valid under state law and bankruptcy law. By reason of the Assignment, the Andersons' interest in the Sakamoto proceeds is superior to the claims of Debtor, the Trustee in Bankruptcy, and any other party, unless that interest must be equita-bly subordinated to other claims. *See* 11 U.S.C. §§ 509–510.

3. The purpose of equitable subordination "is to undo or to offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *In re Kansas City Journal–Post Co.*, 144 F.2d 791, 800 (8th Cir.1944), *quoted in In re FCX, Inc.*, 60 B.R. 405, 410 (Bankr.E.D.N.C.1986). The elements of equitable subordination, codified at 11 U.S.C. § 510(c), are:

(1) Claimant must have engaged in some type of inequitable conduct;

(2) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and

(3) Equitable subordination must not be inconsistent with the provisions of the Bankruptcy Act.

*Matter of Multiponics, Inc.*, 622 F.2d 709, 713 (5th Cir.1980); *In re Pacific Express, Inc.*, 69 B.R. 112, 116 (Bankr. 9th Cir.1986).

4. In adopting 11 U.S.C. § 510(c), Congress specifically rejected proposals that would have required subordination of all insider debts. *See 3 Collier on Bankruptcy* ¶ 510.05, at 510–15 (15th ed. 1979); *In re Delta Smelting & Refining Alaska, Inc.*, 53 B.R. 877, 884 (Bankr.D.Alaska 1985). Subordination requires a showing by specific facts that inequitable conduct by claimants has been detrimental to creditors and, although the inequitable conduct need not be related to the controverted claim as long as it is directed towards the bankrupt or its creditors, a claim can be subordinated only to the extent that a claimant's actions harmed the bankrupt or its creditors. *In re Pacific Express, supra; In re Sepco, Inc.*, 36 B.R. 279 (Bankr. D.S.D.1984).

5. The burden in this case is on Intervenors to prove all of the elements of equitable subordination by a preponderance of the evidence. *Matter of Mobile Steel Co.*, 563 F.2d 692, 700–01 (5th Cir.1977), *quoted in In re Pacific Express, supra,* at 116. The Court realizes that this view is significantly different from that expressed

in *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), wherein the U.S. Supreme Court stated that if an insider's dealings with the corporation are even challenged, the burden is automatically on that insider to show the good faith and inherent fairness of the action. *Id.*, 308 U.S. at 306, 60 S.Ct. at 245. However, that 1939 decision, and the rules on equitable subordination eminating therefrom, have been modified through the years to deal with the realities of the modern bankruptcy proceeding. *See* 3 *Collier on Bankruptcy* ¶ 510.05, at 510–15–510–16 (15th ed. 1979); *see also Matter of Mobile Steel, supra* (objection resting on equitable grounds cannot be merely formal, but rather must contain some substantial factual basis to support its allegation of impropriety); *Matter of Teltronics Services, Inc.*, 29 B.R. 139 (Bankr.E.D.N.Y.1983) (if validity of the underlying claim is in issue, claimant has the burden of proving both the amount and legitimacy of the claim; however, once that burden has been satisfied, the burden shifts to the objecting party to prove substantial inequitable conduct by a preponderance of the evidence).

■ 6. The validity of the underlying claim asserted by the Andersons is no longer at issue in this case. Therefore, Intervenors must produce evidence of substantial inequitable conduct detrimental to the bankrupt or other creditors in order to shift the burden back to the Andersons to prove that their actions were fair and were arm's length transactions. *In re Pacific Express, supra.*

7. Intervenors have alleged several acts of inequitable conduct by the Andersons which Intervenors claim are sufficient to require equitable subordination of the Andersons' claim to the Sakamoto proceeds. First, it is alleged that the Andersons secreted funds from Debtor and used those funds to obtain their interest in Orchid Isle, and that such interest should have been turned over to Debtor.

■ 8. It is not inherently improper for insiders to borrow money from their corporations and to use that money for personal investments. The standard of propriety

for such actions in Hawaii has been stated as:

> [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.

*Guth v. Loft, Inc.*, 23 Del.Ch. 255, 272–73, 5 A.2d 503, 511 (1939), *quoted in Lussier v. Mau-Van Development, Inc. I*, 4 Haw.App. 359, 367–68, 667 P.2d 804 (1983); *see also* 3 Fletcher, *Cyclopedia of the Law of Private Corporations* § 861.1 (rev. perm. ed. 1986).

■ 9. There can be no argument that, at the time the loan was made to Orchid Isle by the Andersons, Debtor was "financially able" to make that same loan to Orchid Isle, and thereby acquire the 2½% interest for itself. However, shopping center development was not an aspect of Debtor's line of business, Debtor did not have an interest or reasonable expectancy in such a business opportunity, and the self-interests of the Andersons were not brought into conflict with those of Debtor by the personal actions of the individuals. This was not a case of a business opportunity pursued by an insider which should have been first offered to the corporation.

10. As for the secretive nature of the Andersons' loan from the Bank through Debtor, the corporate treasurer testified that, although he was not aware of any loan from Debtor itself to Orchid Isle, he was aware that the Andersons had made such arrangements using Debtor's credit line funds. The treasurer was also quick to remind the Court that the Andersons had personally guaranteed the line of credit, so he saw no dispute in their use of the funds. The Court does not believe that a corporate loan is "secret" when, in addition to the president and vice-president (ie. the

Andersons), the treasurer of the corporation (Tamura) is aware of the arrangement.

11. It is true that insiders of a corporation are subject to stricter scrutiny than are non-insiders concerning possible inequitable conduct. *In re Pacific Express, supra; In re Ambassador Riverside Investment Group*, 62 B.R. 147 (Bankr.M. D.La.1986). Further, the Court has been referred to cases bearing factual similarities to the instant action where the claims of insiders have been subordinated. *E.g., DeMet v. Harralson*, 399 F.2d 35 (5th Cir. 1968); *Matter of Multiponics, supra; In re Maddox*, 62 B.R. 510 (Bankr.E.D.N.Y. 1986); *In re Purco*, 76 B.R. 523 (Bankr.W. D.Pa.1987). In each case, however, there were aggravating circumstances that are not present here. For instance, in *DeMet*, the claimant/insider transferred much of the assets of the bankrupt corporation to related entities shortly before bankruptcy. The court stated that claimants "were motivated by their own interests and were willing to destroy the financial stability of the corporation to obtain them." 399 F.2d at 38. In addition, the corporation in *DeMet* had only been in operation for a brief period of time and had continually struggled to meet expenses. Conversely, Debtor has been in business for over thirty years and had no trouble meeting expenses until the conflict arose with Bumstead–Woolford. The Court concludes that the Andersons did not engage in inequitable conduct by borrowing the credit line funds from the Bank through Debtor and thereafter loaning those funds to Orchid Isle as a personal investment.

12. Intervenors' second allegation of inequitable conduct on the part of the Andersons concerns the same loan to Orchid Isle without the establishment of a firm interest rate or date of repayment of the loan. Of course, hind-sight is 20/20, but the facts are that the loan was repaid within a reasonable time, although later than originally expected, and the funds were paid back with interest at the same rate charged to Debtor by the Bank.

13. The Court finds that the arrangement was in fact an arm's length transac-

tion between the Andersons and Orchid Isle. A loan of money was obtained and arrangements were made for repayment. The repayment terms were vague, principally because of the nature of the deal; the future financial situation of Orchid Isle depended on the success of a pending loan application. It is hypothesized by Intervenors that, if Orchid Isle did not receive funding from alternate sources, the Andersons would never have had to pay back the loan to Debtor. This conclusion, however, ignores the fact that the Andersons had personally guaranteed the line of credit to the Bank, and they were ultimately liable for those funds whether or not Orchid Isle repaid their loan. The Court is not aware of any case law or statute which requires that loans between aquaintances be immortalized in stone. While it may not be the most accepted means of doing business, it is heartening to know that a "gentlemen's agreement" can still be used in the modern business world.

14. The final allegation of inequitable conduct is that the limited partnership between Debtor and Greenstone was not an arm's length transaction because, due to another personal friendship of the Andersons, Greenstone was not required to bear a larger portion of the loss incurred on the Bumstead–Woolford subcontract. The partnership agreement was never produced into evidence; the evidence of the relationship that is before the Court is that the only requirement of Greenstone was an initial venture capital investment of $100,-000.00. This amount was necessary for Debtor to obtain the work on the project, and it appears that, for the most part, Greenstone's participation in the project was intended to be limited to its initial investment, with a view to receiving a payback of twice their contribution, the same profit originally expected by Debtor.

15. As general partner in the joint venture, Debtor performed the management functions and bore the necessary operating costs of the subcontract as they arose. Greenstone ultimately contributed an additional $100,000.00 to the joint venture upon request of Edward Anderson and in an

attempt to alleviate the mounting financial difficulties caused by the payment disputes with Bumstead–Woolford. However, Greenstone was under no obligation to do so and the Court does not believe the Andersons had a right to insist upon an additional investment by Greenstone.

16. The Court concludes that the loan obtained by the Andersons from Debtor using the line of credit, the loan from the Andersons to Orchid Isle, and the joint venture between Debtor and Greenstone were all arm's length transactions, and that the Andersons' actions did not rise to the level of inequitable conduct as to require equitable subordination of their claim.

17. Even if Intervenors had borne the burden of showing inequitable conduct, Intervenors would still have had to prove that such inequitable conduct resulted in injury to creditors of Debtor or conferred unfair advantage on the Andersons. *See Matter of Multiponics, supra.*

18. The Court's findings that the personal borrowing of the Andersons did not prevent or interfere with Debtor's use of the line of credit and that the principle cause of Debtor's bankruptcy was the adverse arbitration award resulting from the Bumstead–Woolford dispute instill serious doubt that the actions complained of caused any harm to creditors. Furthermore, it can hardly be said that the conduct of the Andersons conferred an unfair advantage on them personally; they made good on their personal guarantee to the Bank and repaid the loan obtained from Debtor on the line of credit, for the most part through the liquidation of personal assets. In the Court's opinion, the most telling fact in this matter is that, but for a quirk of timing, the Sakamoto proceeds would have been paid to the Bank directly before the satisfaction of the line of credit debt by the Andersons, and that debt would have been reduced accordingly, in effect leaving the amount of the Sakamoto proceeds in the undisputed possession of the Andersons.

19. Based on the foregoing, the Court finds that the Andersons are entitled to payment of the Sakamoto proceeds held by the Trustee, together with any interest thereon, without any deduction by or payment to any other party, person, entity, or creditor whatsoever.

A Judgment will be signed upon presentment.