In re 200 **WOODBURY REALTY TRUST, Debtor.**

**Bankruptcy No. 89-00048.**

United States Bankruptcy Court, D. New Hampshire.

April 5, 1989.

Daniel P. Luker, Sulloway, Hollis & Soden, Concord, N.H., for New England Financial.

Karen M. Shea, Scotch & Zalinsky, Manchester, N.H.

Robert E. Murphy, Wadleigh, Starr, Peters, Dunn and Chiesa, Manchester, N.H., for Comfort Air Systems, Inc.

George Collins, Manchester, N.H., for Partition Co., Inc.

Steven B. Levine, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for First Service Bank for Savings.

William C. Sheridan, Londonderry, N.H., for Dean's Floor Covering.

Elizabeth A. Ryan, Manchester, N.H., for U.S. Land Development Corp.

Stephen G. Hermans, Holland, Donovan, Beckett, Welch & Hermans, P.A., Exeter, N.H., for Wayne J. Griffin Elec. Co.

R. Timothy Phoenix, Portsmouth, N.H., for creditor, Shaines & McEachern, P.A.

Dennis G. Bezanson, South Portland, Me., Trustee.

## MEMORANDUM OPINION ON MOTION FOR RELIEF FROM AUTOMATIC STAY

JAMES E. YACOS, Bankruptcy Judge.

This chapter 7 bankruptcy liquidation proceeding was commenced by an involuntary chapter 7 petition filed on January 18, 1989, against the above-captioned debtor, by three unpaid materialmen and suppliers relating to the debtor's "Carisbrooke" condominium project located in Manchester, New Hampshire. The filing was precipitated by the scheduled foreclosure on January 20, 1989 of the partially completed project by New England Financial Resources, Inc. (hereinafter "NEFR"), a secured construction lender holding first and second mortgages on the property. The project involves four connected buildings of which only the first building (the "first phase") has been completed. The debtor did not contest the involuntary petition. On February 22, 1989 this court entered its Order for Relief under chapter 7 of the Bankruptcy Code. This followed a hearing before this court on February 6, 1989, set by a *sua sponte* order of the court, as to whether the debtor as a realty trust was a qualified debtor for bankruptcy purposes.

NEFR filed on January 25, 1989 the pending Motion for Relief from the Automatic Stay imposed by § 362 of the Bankruptcy Code. The initial hearing thereon was held on February 21, 1989. At that hearing it was determined that NEFR's secured debt, according to its documentation and recording data properly perfected, was in the amount of approximately $13,750,000.00 on its first and second mortgage liens. An additional secured debt in the amount of approximately $2,300,000.00 was held by First Service Bank For Savings in Leominster, Massachusetts (hereinafter "FSB") and a total of approximately $1,500,000.00 in mechanics liens asserted by unpaid materialmen and suppliers encumbered the project. A substantial and comprehensive appraisal report was received into evidence indicating a fair market value of the property in question as of January 6, 1989 of $5,760,000.00. There is no serious dispute by any party that the property does not have a current value in excess of the figure given by the appraiser.

On these facts it is obvious that there is no "equity cushion" in the property which might serve to provide adequate protection to NEFR and justify any delay in lifting the automatic stay for cause under § 362(d)(1) of the Bankruptcy Code. Moreover, inasmuch as no equity is shown in the property, and the property is by definition not necessary for an effective reorganization (this being a chapter 7 liquidation proceeding), no ground for delaying the lifting of the automatic stay is shown under the alternative provision of § 362(d)(2) of the Code.

■ While the foregoing would normally result in a simple order, granting the request to terminate the automatic stay imposed by the bankruptcy filing, the petitioning creditors by written opposition, and orally at the February 21, 1989 hearing, alleged various grounds for attacking or

subordinating the lien and claim of NEFR. The creditors in effect asserted an affirmative defense or counterclaim to the NEFR request for lifting of the automatic stay. This court has previously held in *In re Gellert*, 55 B.R. 970 (Bankr.N.H.1985), that such "extraneous issues" to the statutory issues set forth in § 362 of the Code were not intended to be fully determined at the mandated hearing and decision by the bankruptcy court, within a very short time frame as required by § 362(e) of the Code, on stay relief requests. The court there held that such issues need only be considered in terms of a surface determination regarding such affirmative attacking contentions by parties opposing the automatic stay, i.e., a showing akin to the showing the opposing parties would be required to make if they were seeking affirmative injunctive relief in that regard. *Id.* at pp. 975–976. The court normally will sever such contentions and require that they be pursued by a separate adversary proceeding, and will consider the request for a temporary restraining order in the adversary proceeding simultaneously with the "surface determination" to be made in the stay relief hearing in the case-in-chief.

In the present case the court continued the stay relief hearing to March 21, 1989, and upon agreement of the parties, continued it further to March 30, 1989. The petitioning creditors did file an adversary proceeding in this court (Adversary No. 89–27) against NEFR and FSB on March 20, 1989, setting forth their various grounds for equitable subordination and other relief against the defendants. They also filed on that date a Motion for Temporary and Preliminary Injunctive Relief. At the March 30, 1989 hearing the chapter 7 trustee, Dennis G. Bezanson, announced that he had agreed with the petitioning creditors to substitute himself as the plaintiff in this adversary proceeding, with the petitioning creditors' counsel appointed as special counsel to the trustee for the purpose of the adversary proceeding, and filed

his supplemental memorandum in support of the motion for injunctive relief.[1]

The court accordingly on March 30, 1989 heard the parties with regard to the record, on the stay relief motion in the case-in-chief, and simultaneously heard the affirmative injunctive request in Adversary Proceeding No. 87–27, and heard as relevant to both matters the offers of proof by the parties with regard to the motion for injunctive relief in the adversary proceeding. This Memorandum Opinion by the court will include findings and conclusions relevant to both matters.

■ The trustee's main contention in arguing for equitable subordination and other relief against NEFR and FSB is that when the project got into financial trouble with regard to remaining funds for completion the defendants—particularly NEFR—engaged in a course of conduct that violated an obligation they had to the materialmen and suppliers on the project not to entice those parties to continue finishing work on the first building when it was apparent to the defendants that the remaining and renewed funding would be inadequate to pay for such work. The trustee has submitted in his offer of proof a detailed documentation and exhibits that would indicate, from a hindsight perspective at least, that NEFR may have been pursuing a deliberate scheme to shift the risk of the cost of completing the first phase of the project upon the third parties. However, NEFR on its part has submitted a detailed offer of proof, again supported by extensive documentation and exhibits, indicating that it was merely pursuing the course of conduct that any prudent lender would pursue with regard to a troubled project, and that the ultimate failure of the original and renewed financing to cover all expenses attributable to the first phase of the project was due to external and unexpected events occurring during January to September of 1988. NEFR argues that it could not have foreseen all those events and miscalculations and thus should not be

---

1. The trustee agreed to step into the adversary proceeding as plaintiff only after the petitioning creditors, and other mechanic lien claimants, executed assignments and waivers of their rights to priority positions ahead of general unsecured creditors in this estate.

held accountable to the junior interests in this estate for the ultimate denouement of the project.

The key element for obtaining affirmative injunctive relief, in these circumstances, or alternatively demonstrating an "extraneous factor" sufficient to support denial of relief from the automatic stay, is a showing by the trustee of a likelihood of success on the merits of his various contentions. *In re Gellert*, at p. 975, citing *Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). My review of the entire record of this proceeding leads me to the conclusion that the trustee has failed to meet that test for present purposes.[2]

The record establishes that while NEFR took some actions which arguably enhanced its position, as opposed to the third parties, it likewise took other positions in which it deferred its own interests in the overall attempt to keep the project going. Moreover, NEFR did not have an equity participation in the project apart from its lending activity, nor does it appear from the offers of proof presently before me that it exhibited that degree of extensive and intrusive control and management of the debtor's affairs which would support a definitive finding that it in effect had become a joint venturer or "controlling entity" sufficient to support equitable relief. See, e.g., *In re Carolee's Combine, Inc.*, 3 B.R. 324, 327 (Bankr.N.D.Ga.1980) (totally undercapitalized enterprise and lender had equity participation); *In re Ambassador Riverside Inv. Group*, 62 B.R. 147, 153 (Bankr.M.D.La.1986) (dual relationship not fully disclosed); *In re American Lumber Co.*, 5 B.R. 470, 477 (D.Minn.1980) (bank had "absolute control" over debtor and was "sole beneficiary" of attacked transfers); *In re American Lumber Co.*, 7 B.R. 519, 529 (Bankr.D.Minn.1979) (lender exercised "control over all aspects of finances and operations" of debtor); *Matter of Clark Pipe and Supply Co., Inc.*, 87 B.R. 21, 24 (Bankr.E.D.La.1988) (lender "began advancing loans solely to liquidate Clark's assets.... they were controlling the disbursal of all operating funds and they knew other creditors would not be paid"); *In re Beverages International Ltd.*, 50 B.R. 273, 284 (Bankr.D.Mass.1985) (deceptive actions and delay in recording documents to encourage third parties to extend credit).

Most of NEFR's actions were arguably taken to preserve its secured position in the project—which it had every right to do—and were based upon calculations and assumptions that arguably seemed reasonable in the circumstances at the time those decisions and actions were taken. The trustee's contrary contentions depend to a large extent upon inferences not clearly established even in the offers of proof. The restrictions in funding advances commenced in December of 1987 are not clearly shown to be anything other than the normal supervision of percentage-advances exercised by construction lenders in many building projects.

The trustee also makes much of the fact that NEFR released two of the principals of the debtor from personal guarantees in return for their arranging the $2,300,000.00 additional financing by FSB in June of 1988. No specific reason as to how this harmed the project, or the third parties, has been advanced to this court. The third parties themselves had no rights to go against the principals directly and the $2,300,000.00 indisputably *did* come into the project.[3]

---

**2.** This determination of course has no binding effect with regard to the ultimate determination upon a full evidentiary hearing of the pending adversary proceeding. I recognize that the courts recently have heard an increasing number of cases asserting lender liability in various contexts. There is even a newsletter: *Lender Liability News*, Bureau of National Affairs, Inc., Washington, D.C.

**3.** While not articulated by the trustee or the petitioning creditors, it could be argued that they might have had some rights to force a marshaling of assets, i.e., forcing NEFR to move first against the personal guarantors, which right was lost by the release. However, the great majority of decisions to date deny any such right of marshaling in those circumstances.

The court has considered all of the case decisions cited by the trustee and petitioning creditors but finds that those authorities involved conduct far more egregious than is shown in this case—at least upon the present offers of proof. In addition to the decisions cited above, the trustee cites the case of *In re Fargo Financial, Inc.*, 80 B.R. 247 (Bankr.N.D.Ga.1987), which admittedly has some rather broad and strong language as to possible subordination of a construction lender's secured claim. However, the matter for decision in *Fargo* was a motion to dismiss the complaint under a standard that such motion should be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claims." *Id.* at p. 249. Moreover, the complaint tested in *Fargo* alleged that the construction lender had a twenty-percent profit participation in the project, together with other egregious actions of various kinds.

It is well settled that a creditor is under no fiduciary obligation to its borrower or to other creditors of the borrower in the collection of its claim absent some extraordinary factual circumstance. *Matter of W.T. Grant Company*, 4 B.R. 53 (Bankr.S.D.N.Y.1980), *aff'd*, 699 F.2d 599 (1983), *cert. denied* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed. 2d 97 (1983). Even when a creditor exercised some substantial degree of daily monitoring of its debtor, equitable subordination has been denied. *Id.* at p. 75. It should also be noted that even where the party being attacked has a clear "insider connection" there still must be clear findings of the requisite prohibited conduct before equitable subordination will lie. *Matter of Missionary Baptist Foundation of America, Inc.*, 712 F.2d 206, 212 (5th Cir. 1983). In the non-fiduciary situation the courts generally require a stricter showing of fraud or other inequitable conduct. *In re Vietri Homes, Inc.*, 58 B.R. 663, 665–666 (Bankr.D.Del.1986).[4]

The reason the courts have been reluctant to countenance a too-easy resort to equitable destruction of duly perfected and funded security interests has to do basically with the detrimental effect of allowing such loss of security upon the continued availability of such secured funding in our enterprise economy. Where the secured party is not otherwise involved with the debtor, and is not a joint venturer or insider, the courts have appropriately employed a stringent test before nullifying otherwise duly perfected and valid secured lending transactions. *Matter of W.T. Grant*, supra. That test while stringent can be met —as indicated by the cases cited above. In my judgment however it has not been met in the present case, in terms of supporting the denial of the requested modification of the automatic stay or supporting the granting of temporary or preliminary injunctive relief.

Accordingly, separate orders will be entered in the case-in-chief, granting relief from the automatic stay, and in the adversary proceeding, denying a temporary restraining order or a preliminary injunction.

---

4. The trustee notes the comment of this court in its decision in *In re A.F. Walker & Son, Inc.*, 46 B.R. 186, 189 (Bankr.D.N.H.1985), to the effect that there is an "evolving standard in this area" which does not necessarily require a showing of actual misconduct in the morally reprehensible sense in all instances. However, the decision in *A.F. Walker* involved an insider and an attack on the undercapitalization of the debtor which arguably might have supported recharacterization of the insider's "loans" to the debtor as in effect capital contributions in the true economic sense. In that context, it seemed to this court that actual misconduct was not a necessary element—although this court may be the only court so noting the distinction. Cf. *In re Pacific Express, Inc.*, 69 B.R. 112 (9th Cir., BAP 1986).