### In re AFTER SIX, INC., Debtor.

### Bankruptcy No. 93–11150DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 23, 1995.

---

Neal D. Colton and Joel H. Levitin, Dechert Price & Rhoads, Philadelphia, PA, for debtor.

Leonard P. Goldberger, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, PA, for official committee of unsecured creditors on behalf of reorganized debtor.

Kevin J. Carey, Mesirov, Gelman, Jaffe Cramer & Jamieson, Philadelphia, PA, for Corestates Bank.

William M. Lashner, Lashner & Lashner, Philadelphia, PA, for unions.

Kevin Miller, Berlack, Isaele & Liberman, New York City, for unofficial bondholders' committee.

Alexander N. Rubin and Leslie Baskin, Rubin, Quinn, Moss & Patterson, Philadelphia, PA, for CIT Corp.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant contested matter is an Objection ("the Objection") presented by the Official Unsecured Creditors' Committee ("the Committee") of AFTER SIX, INC. ("the Debtor"), on behalf of the reorganized Debtor, to an unsecured Proof of Claim (Claim No. 320) ("the Claim") filed by Corestates Bank, N.A., as successor to the Philadelphia National Bank ("the Bank"), in an amount now reduced to $5,059,772.10. The Claim arose out of the Debtor's guaranty on a mortgage taken by G Street Associates ("G St."), an affiliate of the Debtor, on real estate located at G Street and Hunting Park Avenue, Philadelphia, Pennsylvania ("the Realty"), at which the Debtor last conducted its business.

The Objection is based upon three grounds: (1) the Debtor received no consideration for the guaranty; (2) the Bank's deficiency claim should be barred because, after foreclosure, it failed to dispose of the Realty in a commercially reasonable manner; and (3) the Bank's claim should be equitably subordinated because of the combined effect of its foregoing conduct and also because, when pressured by organized labor, it urged an affiliated lender to withdraw from financing a pre-petition sale transaction which would have paid substantially more to all unsecured creditors than was realized in the subsequent bankruptcy sale of the Debtor's assets, as authorized in an Opinion of June 11, 1993, reported at 154 B.R. 876 ("After Six I").

We find that the first ground is utterly meritless; the third ground has some equitable basis but is insufficient to support the narrow circumstances in which the extraordinary remedy of equitable subordination will be imposed; and the circumstances relating to the disposition of the Realty, while justifying a reduction in the Claim, is likewise insufficient, in and of itself or taken together with the Bank's other conduct, to justify imposition of equitable subordination. We will also reduce the Claim to give credit for

the Bank's claim on behalf of G St., as assignee of its lease with the Debtor, but only in the net amount of this claim.

## B. FACTUAL AND PROCEDURAL HISTORY

The Debtor, formerly a manufacturer of quality men's formal wear, was a venerable, internationally-famous institution in Philadelphia for many years. It began its formal relationship with the Bank's predecessor after a solicitation for business from the Bank's predecessor in 1986, at which time the Debtor sold its former downtown facility in order to relocate to the more spacious facility at the Realty. In that transaction, the Debtor received a $13 million revolving line of credit ("the Line"), which was ultimately paid off. In addition, G St. borrowed $6.3 million to acquire the Realty ("the Loan").[1] The Loan was secured by, *inter alia*, a mortgage on the Realty, an assignment of a lease between G St. and the Debtor ("the Lease"), and a guaranty of G St.'s obligation from the Debtor ("the Guaranty").

As a result of a substantial decline in the textile industry throughout the United States, and particularly the Philadelphia area, due to the availability of far cheaper labor in South and Central America and Asia, plus certain unwise decisions by Debtor to diversify into other product lines, the Debtor's business began to decline markedly in the second half of the 1980's and the early 1990's. Despite the Debtor's efforts to cut expenses and its decision to cease its unprofitable collateral enterprises, it became clear to the Debtor's management that they could not resurrect the business, and thus a search for potential purchasers of the business was begun. Among the few interested parties found, CSE Acquisition Corp. ("CSE") looked the most promising. CSE was primarily interested in the Debtor's name and good will. It had hoped to move the Debtor's operations to Maryland and continue there the manufacture of certain lines of tuxedos, while farming out certain other manufacturing to "overseas" companies.

The parties now assert wildly divergent approximations of what the sale price in this transaction would have been. The Debtor claims that it would have been $25 million. The Bank, supported by a "Prospect Analysis" attached to the proposed Asset Purchase Agreement ("the Agreement") with CSE, pegs the sale price at $8.6 million.

In any event, the labor union with which the Debtor had a collective bargaining agreement, the Amalgamated Clothing and Textile Workers Union ("the Union"), was opposed to the offer because of CSE's contemplated relocation of the Debtor's manufacturing plant would result in an apparent loss of employment for about 300 of its Philadelphia-based members. However, despite the Union's objections, the Debtor entered into the Agreement with CSE on May 26, 1992.

It was contemplated that the CSE deal would be financed, in part, by a $22 million dollar loan from Congress Financial Corp. ("Congress"), eighty (80%) percent of which was owned by CoreStates Financial Corp. ("CFC"), also the owner of the creditor Bank's predecessor. Because the purchase price offered by CSE would not have been sufficient to retire all debt owed by the Debtor, negotiations with certain key creditors, including the Debtor's senior lender, the Union pension funds, the Debtor's bondholders, and the Bank's predecessor, were being pursued at the same time that Congress was considering the underlying financing. Despite Congress's initial reluctance to fund the CSE purchase, it did not refuse to do the deal outright, but instead investigated the transaction further. As that investigation proceeded, Congress's reluctance to enter into the transaction dissipated. Indeed, Congress ultimately issued a loan proposal letter to CSE ("the Proposal"), received its loan committee's consent to offer the financing, secured the consent of the Bank's predecessor to offer the financing, and even circulated several draft commitment letters to the parties involved. Unfortunately for the Debtor, just as all the loan negotiations were coming

---

1. The Loan was actually made to the Philadelphia Authority for Industrial Development ("PAID"), which nominally purchased the Realty and, in turn, sold the Realty to G St. under an installment sale agreement. PAID was, however, nothing more than a conduit through which certain tax advantages inured to the benefit of the actual loan participants.

to a head, so too were the pressures being exerted by the Union, which very much wanted to kill the deal.

The Union's initial tactic in its effort to frustrate the deal was a federal lawsuit against the Debtor and CSE. The Union argued, in that suit, that the proposed sale to CSE would violate the Debtor's contract with the Union. After several days of testimony, the district court issued an Opinion, *Philadelphia Joint Bd. of Amalgamated Clothing & Textile Workers Union v. After Six, Inc.,* 1992 WL 202170 (E.D.Pa. August 6, 1992), in which it dismissed this suit.

Undaunted, the Union redirected its attack at the Bank, having learned that its affiliate intended to finance the deal. The Union picketed several of the Bank's branches and handed out protest leaflets there. Union leadership also enlisted the support of many prominent politicians, several of whom publicly condemned the loss of local jobs which would result from the sale. The Union's opposition culminated on August 18, 1992, in a highly-publicized protest involving approximately 50 Union members who showed up uninvited at the Bank's central corporate offices and demanded the withdrawal of Congress from the CSE deal. The Bank's President and Chief Executive Officer, Frank E. Reed, was able to diplomatically defuse this protest, but the incident was nonetheless reported conspicuously by the printed news and television media.

Very shortly after this incident at the Bank's corporate offices, on that same afternoon, Reed contacted the late Richard Miller, then President of Congress, and informed Miller that the Bank did not want Congress to fund the sale of the Debtor's assets to CSE. There is conflicting testimony regarding whether this was merely an expression of the Bank's preference, or a thinly-veiled demand that the loan negotiations be terminated. In any event, Miller thereupon placed a call to another official at Congress's office in Chicago and the loan commitment was immediately thereafter withdrawn. Several of the

Bank's witnesses asserted that many other factors contributed to Congress's withdrawal from the CSE deal, such as the Debtor's failure to obtain certain consents from its major creditors; an inability to resolve a dispute between G St. and the Bank regarding G St.'s entitlement to a portion of the sale proceeds; and CSE's diminished prospects of successful, post-sale operations in light of the negative publicity generated by the Union protests. Although we recognize that Congress had from the start reserved its right to withdraw from the deal if these and other contingencies were not resolved, we nonetheless conclude that Congress gave no indication that it was unwilling to go forward with the loan until after the incidents of August 18, 1992, culminating in the phone call from Reed to Miller. Furthermore, with regard to the absent consents, while it is possible that these consents may never have been obtained, thereby undermining the deal, it is also clear to us that Congress's withdrawal killed the deal before the consent issue could be played out and its affect on the deal registered. Thus, we find that the call from Reed to Miller was the primary reason for Congress's abrupt withdrawal from the financing transaction with CSE.

Once Congress withdrew its offer to finance the sale of the Debtor's assets to CSE, that transaction quickly fell apart. CSE could obtain no alternative financiers, and no other purchasers were waiting in the wings. The Debtor remained in business, but its financial health continued to deteriorate, forcing it to file the voluntary Chapter 11 bankruptcy case underlying the instant contested matter on February 26, 1993.[2]

On June 11, 1993, this court, "[w]ith a heavy heart," due to the loss of local jobs which it would cost, 154 B.R. at 878, approved, in *After Six I,* the sale of most of the Debtor's assets to AS Licensing Corp. ("AS"), an entity controlled by Charles Ezrine, the same individual who controlled CSE, for $7.1 million. In so doing, we were obliged to reject a $5 million offer presented

---

**2.** An attempt by the Union to sidetrack the sale to CSE by engineering the filing of an involuntary case against the Debtor by several union members failed when the involuntary petition was

dismissed in a one-page Order of this court of August 13, 1992, in which we found that the petitioners failed to satisfy 11 U.S.C. § 303(h)(1).

by a competitor who expressed an intention to hire some of the Debtor's union employees at its plant in Allentown, Pennsylvania. *Id.* at 882–84.

A liquidating plan of the Debtor was thereafter filed and confirmed on February 9, 1994. Litigation of a large number of contested claims, including a consensually-certified class action brought on behalf of the Debtor's former customers, has consumed the past year. It is believed that the instant disputes is among the last of the case's outstanding contested matters.

On March 16, 1994, the Bank filed the Claim, in the amount of $5,334,911.49, based on amounts allegedly owed under the Guaranty. The Bank also filed another claim (No. 430) on August 30, 1993, in the amount of $3,360,381.16, representing its damages arising from the Debtor's rejection of its Lease with G St., of which the Bank has taken an assignment ("the Lease Claim"). The Committee, on behalf of the Debtor, also filed an objection to this claim on May 10, 1994. At the commencement of the hearing on the Objection in issue, the parties announced that they had settled the Lease Claim, and ultimately submitted a stipulation proposing that the Lease Claim be allowed as an unsecured claim in the amount of $2,325,450. Court approval is pending the running of the period to file Objections thereto. The Bank also agrees that post-petition rent payments reduced the instant Claim to $5,059,772.10.

Also relevant to the treatment of the Claim are the events which occurred in late 1993, when the Bank decided, after being unwilling to take title to the Realty after its foreclosure due to potential adverse environmental conditions in the Realty, to sell the note and security agreement executed in conjunction with the Loan (collectively, "the Note"). In December 1993, Bernard Korman, one of the Debtor's principals and a G St. partner who was intimately involved in the failed CSE transaction, learned, allegedly unexpectedly, that Packing Coordinators, Inc. ("PCI"), a corporation of which Korman was then president, was in need of a larger facility. Korman, being aware of the Bank's intention to sell the Note, suggested to a representative of PCI that he contact the Bank and inquire about the availability of the Realty. At some time on or before December 15, 1993, the Bank learned of PCI's interest in the Realty and its willingness to purchase the Note.

However, shortly thereafter, on December 16, 1993, the Bank's counsel introduced the Bank to one of its clients, Stormin Realty, Inc. ("Stormin"), which was also interested in acquiring the Realty through the purchase of the Note. With two expressions of interest on board, Michael Jordan, the Bank's workout officer in charge of liquidating the Note, began negotiations with the parties. However, Jordan's negotiation with each of these potential purchasers followed a dramatically different course. Stormin was offered the Note for $600,000, whereas the initial asking price quoted to PCI was $900,000. Thereafter, the Bank remained in constant contact with Stormin regarding the sale of the Note, whereas PCI experienced great difficulty in getting the Bank and its agents to so much as return its telephone calls. The Bank refused to disclose any information about Stormin or its bid to PCI so that PCI could attempt to submit a higher bid. Despite its alleged concerns about the financial wherewithal of PCI, the Bank apparently made no attempt to confirm Korman's assertion that PCI had sufficient funds in its bank account to cover its bid. Stormin was never asked for a written agreement of sale, although the Bank refused to consider PCI's bid without one. The sum of the testimony and other evidence leaves no question in our mind that the Bank was eager to negotiate with Stormin, but utterly unreceptive to bids from PCI.

In the final twenty-four hours before year's end, the arbitrary closing deadline for the sale of the Note imposed by the Bank, the Bank threw up a number of additional roadblocks which kept PCI from competing with Stormin for the purchase of the Note. In the end, the Bank sold the Note to Stormin for $500,000 despite the presence of an earlier communicated willingness by Korman that PCI would bid as high as $750,000 for the Realty; Korman's submission of a written higher bid of $505,000; and an offer from another PCI officer, according to the Bank

after Stormin's bid had been accepted, agreeing to immediately increase its offer to $550,000. Although the Bank went to some length in testimony and its briefing to attempt to explain why the PCI bid was deficient, including a provision in PCI's initial bid, which Korman stated that PCI was ultimately willing to waive, that the Guaranty be cancelled, it is quite clear to us that the Bank never seriously considered the PCI bid, probably because it had no desire to deal with any entity related to Korman or G St.

The Committee, on behalf of the Debtor, filed the Objection to the Claim on April 8, 1994, based on the grounds recited in the Introduction to this Opinion at pages 221–22 *supra.* On August 3, 1994, the parties entered into a Stipulation to resolve a motion by the Bank seeking to obtain relief from the automatic stay to pursue a state-court Deficiency Judgment Act proceeding against the Debtor under the Guaranty. By this Stipulation, the Bank agreed not to pursue its deficiency claim in state court, and the Committee agreed to litigate the deficiency claim issue in this court 45 days after the Objection was decided.

After several continuances of the hearing on the Objection, this court entered an Order of September 14, 1994, which, *inter alia,* scheduled the hearing on the Objection on a must-be-tried basis on November 30, 1994. On the date of the hearing, the Bank filed a succinct pre-trial brief, addressing some of the issues raised by the Objection. When the hearing could not be completed on November 30, 1994, it was carried over to, and completed on, December 6, 1994. On the first day of the trial, the parties agreed that the amount of the Claim, if allowed, should be reduced by the larger of the fair market value of the Realty or $500,000, the latter figure representing the amount paid by Stormin for the Note.

Pursuant to our post-trial Order dated December 7, 1994, the Debtor filed a lengthy post-trial brief on December 30, 1994, and the Bank filed an even longer responsive brief on January 13, 1995. In its post-trial brief, the Debtor raised, for the first time, the additional argument that, since the Bank disposed of its collateral, *i.e.,* the Note, in a "commercially unreasonable" fashion, its entire deficiency Claim should be wiped out, citing certain sections of Article 9 of the Uniform Commercial Code ("the UCC") in support of such relief. Now that all of the issues have been engaged and each party has had ample opportunity to present its case, the controversy is ripe for our determination.

## C. DISCUSSION

### 1. CLAIM DISALLOWANCE

#### a. *The Guaranty Was Supported by Ample Consideration*

■ The Committee argues, at least in its written Objection, that the Debtor's Guaranty of the G St. Loan was not supported by consideration and that the Claim should be disallowed in its entirety for that reason. We note that the Committee has devoted very little, if any, of its post-trial brief to this issue, perhaps in acknowledgement of our statements, in the course of the hearing, that we believe this contention to utterly lack merit.

In its initial brief, the Bank cited *Paul Revere Protective Life Insurance Co. v. Weis,* 535 F.Supp. 379 (E.D.Pa.1981), *aff'd,* 707 F.2d 1403 (3d Cir.1982), in support of its position. We agree that this case is on "all fours" with the issue before us and dispositive of this particular ground of the Objection.

The facts of the *Paul Revere* case are somewhat complex, although the legal principles annunciated therein are not. The parties to the *Paul Revere* case were all participants in a "leveraged lease agreement." The district court defines a "leveraged lease agreement" as

> an agreement whereby the lessee selects the type and cost of equipment to be leased. The equipment is then purchased by the lessor from the manufacturer and leased by the lessor to the lessee. The lessor pays part of the cost of the equipment with its own funds and finances the balance by the issuance of a note in favor of an institutional lender. The note is typically secured by a security interest in

the equipment and by an assignment of the lease. *Id.* at 381. In the *Paul Revere* case, the lessor was a limited partnership ("the Lessor"). In order to secure the loan from the institutional lender ("the Lender") to the Lessor, not only was the Lessor required to give Lender a security interest in the equipment and an assignment of the lease between Lessor and the lessee ("the Lessee"), but also the limited partners of Lessor ("the LPs") were required to guarantee repayment of the loan. *Id.* at 381–82.

As one might expect, the Lessee fell upon hard times and stopped making rental payments to the Lessor. The Lessor, in turn, failed to make certain installment payments to the Lender, and the Lender declared its loan in default. *Id.* at 383.

> Three days later ... the [Lender] commenced this action against the [LPs]. The [Lender] did not commence suit against [the Lessor] as the principal debtor nor did they declare, as assignees of the equipment lease, a default under the equipment lease even though [the Lessee] failed to make the rental payments required by the lease. The [Lender] also ... made no attempt to recover possession of the [leased equipment].

*Id.* The LPs argued that the Lender's action must be dismissed because the LPs received no benefit from the Loan, nor were their guaranties otherwise supported by consideration, and were, therefore, unenforceable. *Id.* at 384.

The court found three independently sufficient sources of consideration for the guaranties. First, the court noted that the extension of credit by the Lender was itself sufficient consideration, even though the loan proceeds did not pass directly to the LPs. *Id.* at 385 ("[T]o have an enforceable guaranty contract, it is not necessary that consideration pass directly to the surety; the extension of credit to the principal debtor is sufficient consideration for the promise of the surety."). *See also* the other cases cited at *id.* Next, the court concluded that because the guaranties were a condition of the loan, the Lender's reliance on the LPs' guaranties supplied the necessary consideration. *Id.* at

386 ("The reliance by the [Lender] on the guaranties submitted by [the LPs] supplies the necessary consideration to support the guarantees."). Finally, because the LPs signed the guaranties "intending to be legally bound," the court concluded that the guaranties could be enforced against the LPs even in the absence of traditional consideration under the terms of the Pennsylvania Uniform Written Obligations Act. *Id.* at 386. *See also* 33 P.S. § 6 (1967) ("A written release or promise, hereafter made ·and signed by the person releasing or promising, shall not be invalid or unenforceable for lack of consideration, if the writing also contains an additional express statement, in any form of language, that the signer intends to be legally bound."). *Accord, Fasco, A.G. v. Modernage, Inc.,* 311 F.Supp. 161, 164 (W.D.Pa.1970) ("[the Guarantor's] agreement ... 'to be severally liable for the obligation of [the company]' is a clear and formal expression of [the guarantor's] intent to be legally bound ... and, under the [Written Obligations] Act, is enforceable against the [guarantor] regardless of whether consideration existed for [the guarantor's] promise.").

The similarities between the circumstances of the *Paul Revere* case and the case now before us are striking. The Committee complains that the Debtor received no benefit from the Loan or other consideration for its Guaranty and that the Bank did not even pursue the primary obligor, G St. The situation in *Paul Revere* was no different. Moreover, like the Lender in *Paul Revere,* the Bank funded the Loan to G St. because it secured the Debtor's Guaranty. Furthermore, there is no dispute that the Debtor's Guaranty was a condition to the Loan, which is strong evidence of the Bank's reliance on the presence of the Guaranty when it agreed to fund the Loan. According to the Guaranty itself,

> *[i]n order to induce [the Bank] to make the above described Loan to the Authority,* the [Debtor] ... has agreed to guarantee to [the Bank] and the Authority, [G St.'s] performance of its obligations under the Installment Sale Agreement, Loan Agreement and other documents and agreements executed by [G St.] in favor of ei-

ther Authority or [the Bank]. (emphasis added).

Indeed, the Committee's own witnesses acknowledge that the Guaranty was duly authorized by the Debtor because the Bank would not have made the Loan to G St. without it. Finally, the Guaranty itself clearly states: "NOW, THEREFORE, in consideration of the Property set forth herein, *and intending to be legally bound hereby,* the Guarantor does hereby covenant and agree as follows...." (emphasis added).

All three sources of consideration found in the *Paul Revere* case are present here. Therefore, we will not disallow the Claim on the ground that the Guaranty lacked consideration.

b. *The Uniform Commercial Code Prohibition Against Commercially Unreasonable Disposition of Collateral Does Not Apply to the Facts of This Case, Which Involves a Realty Transaction.*

There was nothing in the Objection or in the way that the Committee presented its case at trial which suggested to us that the Committee was relying on Article 9 of the UCC, 13 Pa.C.S. § 9101, *et seq.,* as a basis for one of its contentions. Thus, we were surprised by the Committee's assertion, in its post-trial brief, that the Bank failed to meet its reciprocal burden of proof once it had "raised the issue of commercial reasonableness" under the UCC as an issue. Because no stretch of the evidence, testimony, or trial argument could be said to have given the Bank fair warning that the prerequisites of Article 9 of the UCC were in issue, the Bank could hardly have anticipated that it was obliged to present evidence on this issue.

In any event, we hold that the UCC does not apply to the Bank's sale of the Note. The Note, it must be remembered, was secured by an interest in real estate, *i.e.,* the Realty. Article 9 of the UCC, which embraces the UCC sections cited by the Debtor, 13 Pa.C.S. §§ 9504, 9507, does not apply "to the creation or transfer of an interest in or lien on real estate...." 13 Pa.C.S. § 9104(10) (1984). *See United States v. Edwards,* 765 F.Supp. 1215, 1222 (M.D.Pa.1991); and *In re Carr,* 18 B.R. 794, 795 (Bankr.

E.D.Pa.1982). *See also, e.g., United States v. Hoffman,* 170 Ariz. 477, 479, 826 P.2d 340, 343–44 (App.1992); and *Commerce Union Bank v. May,* 503 S.W.2d 112, 116–17 (Tenn. 1973). The Bank merely transferred its interest in the Realty to Stormin. That transaction was not governed by the UCC.

This scenario should not be confused with what professors White and Summers refer to as a "realty paper" transaction, described as follows: "B mortgages his real estate to L. L gives B's note and the real estate mortgage to Bank as security for a loan. Article Nine does not apply to the transaction between L and B, but does apply to that between L and Bank." J. WHITE & R. SUMMERS, II UNIFORM COMMERCIAL CODE, PRACTITIONERS EDITION, § 23–7, at 270 (3d ed. 1988). *See also* Official Comment 4 to § 9–102(3) of the UCC (containing a slightly more complex hypothetical than that from which White and Summers derived their example).

The transaction between L and Bank in the above hypothetical is nothing more than a secured transaction in which the collateral is an instrument. 13 Pa.C.S. § 9102(c) of the UCC provides that such "two-tier" transactions are within the UCC's coverage. *See* 13 Pa.C.S. § 9102(c) (1988) ("The application of this subdivision to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this division does not apply."). *See also Securities & Exchange Commission v. Elliott,* 953 F.2d 1560, 1580–81, 18 U.C.C.Rep.Serv.2d 588, 594–96 (11th Cir.1992); *In re Allen,* 134 B.R. 373, 375, 16 U.C.C.Rep.Serv.2d 1165, 1167 (9th Cir. BAP 1991); *Rodney v. Arizona Bank,* 172 Ariz. 221, 223–24, 836 P.2d 434, 436–37 (App.1992); and *Riebe v. Budget Financial Corp.,* 264 Cal.App.2d 576, 583–84, 70 Cal.Rptr. 654, 658 (1968).

Therefore, had the Bank borrowed money from Stormin and pledged the Note as security, then the UCC would have applied and the Bank would have been able to resort to Article 9 of the UCC for remedies under a claim that Stormin disposed of the Note in a "commercially unreasonable" manner. Such is not the case here. The Bank transferred

the Note to Stormin absolutely. This transaction was therefore not a secured transaction, but, rather, it was a sale of an interest in real estate not unlike the transaction between L and B in the White and Summers' example cited at page 227 *supra.* Under either scenario, the UCC is not applicable to the transaction, in which the Debtor was simply the guarantor of a real estate mortgage.

Because the Committee's "unreasonable disposition of collateral" argument is based upon an improper application of the law, the Debtor has invoked no ground upon which we can disallow the Claim based on Article 9 of the UCC, even assuming *arguendo* that we could overlook the Committee's failure to raise this issue in proper and timely fashion.

### c. *The Bank Has Adequately Proven the Amount of Its Claim*

The Committee also asserts that the Bank has failed to meet its burden of proving the amount of its Claim for allowance purposes at the trial in issue, and therefore the Claim must be denied. This argument represents an oversimplification of the law. In fact, a proof of claim is *prima facie* evidence of the validity and amount of a claim, and the burden to prove the validity and amount of the claim only falls upon the claimant *after* the claim is objected to *and* the objector introduces evidence supporting its objection. *See* Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."). *See also In re Allegheny International, Inc.,* 954 F.2d 167, 173–74 (3d Cir. 1992); and *In re Leedy Mortgage Co.,* 111 B.R. 488, 491 (Bankr.E.D.Pá.1990).

Typically, when a debtor objects to the amount of a creditor's claim, it advocates an alternative (and presumably lower) figure, and sometimes even explains how this alternative figure is calculated. Here, the Committee posits no figure of its own, nor did it offer any evidence which would cause us to question the Bank's calculation of the Claim.

The closest that the Committee comes to actually specifying error in the Bank's calculation is to point to two seemingly inconsistent reports regarding whether or not the January 1993 monthly payment was made and credited. Instead of soliciting testimony that such payment was indeed made and then showing how the Bank's Claim calculation did not take the payment into account, however, the Committee suggests that the existence of an inconsistency in the Bank's records, without more, is sufficient proof that the Claim amount is incorrectly calculated. An unrelated party to the transaction, like this court, needs more help than that if it is to recalculate claims with any degree of certainty. We are satisfied with the Bank's explanation of this alleged inconsistency, *i.e.,* that the payment made in January 1993 was referenced as the December 1992 payment, and we are also satisfied with the Bank's explanation of the calculation of its Claim as a whole.

At best, the Committee has tried, rather unsuccessfully, to cast into doubt the reliability of the Bank's record-keeping and its Claim calculation process. However, we find that this process, as explained by the Bank's witness on this issue, Raymond Stankus, was that commonly performed by all banks, and we think they deserve at least a slight presumption of reliability. While we agree with the Debtor that "no system[,] in which human beings interact with computing machines[,] is infallible," stating such a general truth, which can indeed be applied on all human endeavor, without locating actual instances of error, is not sufficient to burst the presumption of validity which is enjoyed by properly-filed claims.

### d. *The Parties Should Agree that the Bank's Claim Will Be Reduced by $750,000 Despite Their Pre–Trial Stipulation Requiring a Further Hearing to Value the Realty.*

As we noted at page 225 *supra,* the parties stipulated at trial that the Claim should be reduced by the fair market value of the Realty or by the $500,000 which the Bank received from the sale of the Note to Stormin, which-ever is larger. This resolution, on its face, seems to require us to reduce the amount of the Claim by the larger of the two

values mentioned above, but only after a further hearing at which the fair market value of the Realty is determined.

However, this court must observe that it finds that the Bank's refusal to properly entertain PCI's higher bid, which Korman credibly testified would have been as high as $750,000 if Jordan and the other Bank officials had handled the competitive interest in the Realty properly, was grossly improper. Thus, the Bank's virtual outright refusal to even test the legitimacy of a potential higher bid than that of Stormin which was literally dropped in its lap shocks the conscience and, in our view, warrants deducting the probable amount of PCI's bid from the amount of the Bank's Claim in lieu of deducting the fair market value of the Realty, even if, as we suspect, the fair market value, from an appraiser's standpoint, was lower than $750,-000. Probably because it would reduce his liability as a guarantor, Korman was, we find, in a position to successfully urge PCI to offer $750,000 for the Realty. We accept that figure as one which the Bank, had it utilized ordinary good sense in establishing a process of bidding on the Realty, could have obtained, and should now be required to credit to the Debtor.

We have considered the Bank's argument that, in this sequence of events, it was merely looking out for its own best interests, and that any third party harmed as a consequence has no legal basis upon which to complain. However, we first note that the Bank sold the Note after the Debtor's bankruptcy had been filed when everyone, including the Bank, knew full well that the Debtor was insolvent and that the size of its estate was hopelessly insufficient to meet the claims of all of its creditors. The Bank was notified quite early in this process about PCI's interest (indeed, the Bank learned of PCI's interest the day before it was even introduced to Stormin (*see* page 224 *supra*), and was, as a result of Korman's unreciprocated efforts, kept continually apprised of PCI's continued interest, the terms of its bid, and its financial wherewithal. While the Bank may have distrusted Korman and anyone associated with Korman, it presented no evidence why this was so or why any taint associated with

Korman and G St. should have been visited upon PCI. Indeed, we are left with the nagging impression that the Bank's anxiety to deal with Stormin, and its reluctance to deal with PCI was "personal," and, unlike its decision to pull out of the CSE financing, *see* pages 232–34 *infra*, not based upon any articulated legitimate business concerns.

The Bank has offered several reasons why the PCI bid was unacceptable, but they all ring hollow. Although the Bank attempts to pin blame on PCI for its "late" bid submission, we note that the Bank itself never articulated most of its concerns until the eleventh hour. It is therefore clear to us that the Bank was aware of many of the terms of the PCI bid relatively early in the process, and that it not only made no attempt to learn more, but that it actually threw up roadblocks in order to hamper any efforts on the part of Korman and PCI to communicate PCI's bid. Furthermore, many of the conditions and requirements that the Bank imposed on the PCI bid were not imposed on the Stormin bid. Although it is conceivable that different purchasers may require different precautions, the Bank made no attempt to explain why disparate treatment was called for in this instance. The facts do not support the conclusion that this is a case in which a lender is showing a preference to an existing client or an organization it knows well. The Bank had never met Stormin until its counsel made the introduction, which was at least one or two days *after* it became aware of PCI's interest in the Realty.

While we cannot say for sure that PCI was a viable and superior alternative, based on the rather shocking lack of its investigation by the Bank, neither could the Bank. From the evidence presented at trial, it is clear to us that PCI would have offered $750,000 for the Note, and perhaps more. We therefore conclude that it is most likely that we would reduce the Bank's Claim in an amount of $750,000, which we find could have been realized from the sale, rather than by only $500,-000, which was actually realized, irrespective of the fair market of the Realty. Only in the unlikely event that it is established that the fair market value of the Realty is equal to $750,000 or more would we be inclined to

change our calculations, and then only by reducing the Claim further.

We offer the parties a shortcut to resolution of the issue of the credit of the Debtor against the Bank's Claim as a result of the sale of the Note. If this offer is accepted, the parties will avoid a time-consuming, costly, and difficult exercise to ascertain the value of the Realty as of December 31, 1993, which is now over a year ago. Such efforts do not appear worthwhile to dispute a small differential in a claim which will be payable in an amount of less than ten (10%) percent of the Claim's face value. We are thus inclined to find that, since the Bank could have probably obtained $750,000 from PCI for the Realty at the time of its disposition, the Claim should hence be reduced by that amount. Considering the foregoing, we believe that the financial interests of both parties will be served by their acceptance of our suggestion that the Bank's Claim be reduced by $750,000 and leave it at that. In our Order, we will schedule a status conference to determine whether this suggested resolution is acceptable to the parties.

■ The Committee also wants us to reduce the amount of the Claim by the stipulated face value of the Lease Claim, *i.e.*, $2,325,450. However, we note that the Lease Claim is an unsecured claim and the Bank will receive only a fraction of its face value through distribution under the Debtor's bankruptcy plan. Thus, while we agree that the amount of the Claim must be reduced in some amount in light of the disposition of the companion Lease Claim, based on the analysis below, we believe that the proper amount to be subtracted from the Claim is the actual, not face, value of the Lease Claim.

■ We start our analysis with the simple proposition that an undersecured claimant's deficiency claim (*i.e.*, the unsecured portion of its claim) is simply the value of its entire claim less the value of its collateral. 11 U.S.C. § 506(a). The Claim is nothing more than the unsecured, deficiency claim which the Bank seeks to recover from the Debtor, as opposed to G St., through the Guaranty. We have already agreed to subtract from the Claim the value of one piece of the Bank's collateral, namely the amount which it received (or should have received) in its disposition of the collateral, *i.e.*, the Note relating to the Realty. The Bank is also secured by the Lease (and the rents generated therefrom) which was assigned to it at the time of the Loan.[3] Because the Debtor has rejected the Lease, the Bank's security interest in the rents generated by the Lease is now represented by its Lease Claim. There is no question that the value of this collateral must also be subtracted from the Claim. The question is, how do we properly value the reduction for this collateral?

We are aided in our inquiry by an analogy to a debtor, X, and its undersecured accounts receivable lender, Y. On the day X files bankruptcy, Y is owed $500,000 and is secured by accounts having a face value of $250,000. However, the collection value of those accounts is only $150,000. It is quite clear that Y's secured claim would equal $150,000, not $250,000. Likewise, the actual amount of money that the Bank will receive on its Lease Claim is the actual value of that piece of collateral, and not its face value. Thus, that net actual figure, and not the entire $2,325,450 face value, of the Lease Claim must be subtracted from the amount of the Claim in order to arrive at the rightful

---

**3.** The Lease was actually assigned to PAID, which in turn assigned it to the Bank. We can tell from the face of the assignment that the document was duly recorded at the time of the Loan. It follows from this that the Bank has a perfected security interest in the rents generated by the Lease. *See Commerce Bank v. Mountain View Village*, 5 F.3d 34, 38–39 (3d Cir.1993); and *In re Union Meeting Partners*, 163 B.R. 229, 237–38 (Bankr.E.D.Pa.), *aff'd*, No. 94–1074 (E.D.Pa. April 21, 1994).

Of course, pursuant to the terms of the original Lease assignment, PAID, and consequently the Bank, is only entitled to collect the rents while any portion of the Debtor's debt remains outstanding. Thus, the value of the rental stream to the Bank is capped by the outstanding amount owed by the Debtor on the Loan. This point is largely academic, however, because the Bankruptcy Code limits the amount of damages a creditor may receive from lost rents as a result of a debtor's lease rejection. *See* 11 U.S.C. § 502(b)(6). That value in this case, as further limited by the parties' stipulation, is, even at face value, less than the total amount of the Claim.

amount of the Bank's unsecured, deficiency Claim.

Since we do not know the dividend being paid to the Debtor's unsecured creditors under the Plan, we cannot compute this precise figure at present. However, if the dividend were ten (10%) percent, the Lease Claim would be worth only $232,545.00. It is this figure which would be deducted from the Bank's Claim to properly measure same.

## 2. CLAIM SUBORDINATION

■ As an alternative to complete or partial disallowance, the Committee seeks the equitable subordination of the Claim, pursuant to 11 U.S.C. § 510(c)(1) which provides, in pertinent part, that "the court may—(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim...." In order to successfully subordinate a claim, the movant must establish the following elements:

(i) The claimant ... engaged in some type of inequitable conduct....

(ii) The misconduct ... resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant....

(iii) Equitable subordination of the claim ... [is] not ... inconsistent with the provisions of the Bankruptcy Act.

*In re Comtec Industries, Inc.*, 91 B.R. 344, 347 (Bankr.E.D.Pa.1988) (citations omitted). *Accord, In re Mobile Steel Co.*, 563 F.2d 692, 702 (5th Cir.1977); *In re Paolella & Sons, Inc.*, 161 B.R. 107, 117 (E.D.Pa.1993), *aff'd*, 37 F.3d 1487 (3d Cir.1994); *In re Nutri/System, Inc.*, 169 B.R. 854, 865 (Bankr.E.D.Pa. 1994); *In re 641 Associates, Ltd.*, 140 B.R. 619, 627 (Bankr.E.D.Pa.1992); and *In re*

*Beck–Rumbaugh Associates, Inc.*, 103 B.R. 628, 635 (Bankr.E.D.Pa.1989), *aff'd*, 114 B.R. 418 (E.D.Pa.1990).[4]

■ Furthermore, it must be noted that equitable subordination is an extraordinary measure which is not lightly invoked. *See Nutri/System, supra*, 169 B.R. at 865; *Claxton, supra*, 76 B.R. at 546 ("Like other forms of equitable relief, equitable subordination in bankruptcy is not to be invoked lightly."); *In re Tinsley & Groom*, 49 B.R. 85, 90 (Bankr.W.D.Ky.1984) ("[E]quitable subordination is a harsh remedy that is not to be lightly invoked."); and *Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484, 499 (Bankr.S.D. Ohio 1982) ("Subordination is essentially a discretionary exercise of the court's equitable powers, and should only be used sparingly to rectify obvious inequities.").

It is also established that, in a practical sense,

[t]he courts have actually confined equitable subordination of claims to three general categories of cases: those in which a fiduciary of the debtor misuses his position to the disadvantage of other creditors; those in which a third party, in effect, controls the debtor to the disadvantage of others; and those in which a third-party defrauds other creditors.

*In re CTS Truss, Inc.*, 868 F.2d 146, 148–49 (5th Cir.1989) (footnotes omitted). *Accord, In re United States Abatement Corp.*, 39 F.3d 556, 561 (5th Cir.1994); *Paolella, supra*, 161 B.R. at 117–18; and *Nutri/System, supra*, 169 B.R. at 865–66. Furthermore, a party seeking equitable subordination must show, with particularity, egregious conduct on the part of the claimant unless the claim-

---

4. The *Mobile Steel* court, which first articulated the three-part equitable subordination test noted here, also stated three principles to be considered in conjunction therewith:

    a) Inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim.

    b) A claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct.

    c) The burden of proving all the elements of subordination is on the objectant. ... [T]he objectant must prove by a preponderance of the evidence that the claimant engaged in such substantial inequitable conduct to the detriment of the debtor's other creditors that subordination is warranted.

563 F.2d at 700–01. *Accord In re Pacific Express, Inc.*, 69 B.R. 112, 116 (9th Cir. BAP 1986); and *In re Claxton*, 76 B.R. 539, 542 (Bankr. E.D.Va.1987).

ant is an insider, the only setting in which the burden on the objectant is less demanding. *See In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir.1986); *Pacific Express, supra*, 69 B.R. at 116; *Nutri/System, supra*, 169 B.R. at 865–66; and *In re Teltronics Services, Inc.*, 29 B.R. 139, 169 (Bankr.E.D.N.Y.1983). The Committee has made no allegation that the Bank is an insider; therefore, the more stringent standard applies.

a. *The Bank's Involvement in the Failed CSE Sale Transaction Does Not Justify Equitable Subordination of the Claim*

The Bank's allegedly wrongful conduct in causing Congress's withdrawal from the CSE loan and sale transaction does not fit neatly into any of the three categories of the cases cited as paradigms by *Mobile Steel*, and the many cases following it. As noted immediately above, the Committee has made no allegation that the Bank is an insider or a fiduciary of the Debtor. Furthermore, the Committee does not assert that the Bank controlled the Debtor to the detriment of other creditors. Nor does the Committee claim that the Bank defrauded the Debtor's other creditors. Although we do not believe that these general categories of behavior encompass every form of inequitable conduct which warrants subordination, it is unlikely that a creditor whose conduct does not fit within one of these categories will be proven to have engaged in the sort of conduct which implicates § 510(c).

In a nutshell, the Committee is objecting to the Claim, *inter alia*, because the Bank's decision to pressure its subsidiary to pull out of the CSE deal was motivated by a self interest which was contrary to the interests of the Debtor and its other creditors. In so pressing its position, the Committee makes the perplexing argument that the Bank's decision was not based on a legitimate business rationale, but "was motivated purely by concerns about its corporate image, not about

money." This position, if sincere, is naive. Publicity and image does indeed equate to money, or businesses would not spend so much on public relations. If the Bank decided that the negative publicity which would have accompanied the CSE deal outweighed the benefits of having its Claim paid in full, we fail to see how the decision to forego the credit was capricious, or even unwise. Thus, it is stranger still that the Bank seems to apologize for this legitimate motivation by arguing strenuously, although rather unconvincingly, that other factors dictated its withdrawal.[5]

The fact that the Bank sought to advance its public-relations interests, and that these interests were contrary to those of other creditors, may have been unfortunate, but did not render the Bank's conduct inequitable. *See Kham & Nate's Shoes No. 2 v. First Bank*, 908 F.2d 1351, 1358 (7th Cir. 1990) ("The Bank was entitled to advance its own interests, and it did not need to put the interests of the Debtor and the Debtor's other creditors first."); *In re Aluminum Mills Corp.*, 132 B.R. 869, 896 (Bankr. N.D.Ill.1991) ("There is no duty of 'kindness' among non-fiduciaries.... Indeed, a non-fiduciary may act strategically to protect itself to the potential detriment of others."). *Accord, In re SRJ Enterprises, Inc.*, 151 B.R. 189, 197 (Bankr.N.D.Ill.1993); *In re Heartland Chemicals, Inc.*, 136 B.R. 503, 517 (Bankr.C.D.Ill.1992); and *In re Pinetree Partners, Ltd.*, 87 B.R. 481, 488 (Bankr.N.D. Ohio 1988). Even if the Bank's decision could be classified as "wrongful" in light of its status as a creditor, this conduct certainly falls far short of the "egregious conduct" standard that applies to non-insiders in order to justify subordination of their claims.

In a vast majority of the refusal-to-lend cases which we have found, the courts have held that the lender's refusal to lend or continue lending, although devastating for the debtor, is not inequitable. *See, e.g., Kham & Nate's Shoes, supra*, 908 F.2d at 1356–59; *CTS Truss, supra*, 868 F.2d at 148–49;

---

**5.** It is also somewhat disappointing that the Bank considers it appropriate to point out that killing the loan and sale transaction to CSE might have been justified because it protected the public interest in preserving jobs as only as a

second or third alternative argument. It is, we would suggest, not at all unreasonable to argue, first and foremost, that serving the public good may justify actions which are inequitable to a certain creditor body.

*Heartland Chemicals, supra,* 136 B.R. at 516–20; *Pinetree Partners, supra,* 87 B.R. at 488–90; and *Tinsley & Groom, supra,* 49 B.R. at 90–91 (all holding that lender's decision not to lend or to continue lending money did not constitute egregious conduct warranting the subordination of the lender's claim). *Compare In re Ambassador Riverside Investment Group,* 62 B.R. 147, 153–55 (Bankr. M.D.La.1986) (claim equitably subordinated when a lender committed to providing credit through a loan fund, knowing it had no funds to do so).

The Bank, in both of its briefs, compared the instant fact situation to, particularly, the facts of *CTS Truss, supra.* In that case, the debtor alleged that a bank officer promised to extend it a loan so that the debtor might expand its business. 868 F.2d at 147. Although no written commitment was ever executed, allegedly two promissory notes were drafted and executed. *Id.* The debtor claimed that, in reliance on lender's promise, it overextended itself and eventually had to file bankruptcy. *Id.* However, the court noted that the debtor's "allegations ... do not conform to any of the paradigmatic cases for equitable subordination." *Id.* at 149. This fact, coupled with the court's observation that the bank made no misrepresentations to competing creditors or in any way improved its collateral position as a result of these representations, *see id.,* convinced the court to affirm the lower court's refusal to subordinate the bank's claims.

The Committee, on the other hand, argues that the *Ambassador* case is more on point. In that case, the debtor was interested in purchasing a hotel and was introduced to a loan broker who indicated that he could locate and procure the requisite financing. 62 B.R. at 149. The broker, who was being paid for his representation by both the borrower and the lender, made affirmative misrepresentations that the lender had committed to making an acquisition loan and a permanent take-out loan. *Id.* at 149–50. In fact, the "lender" was nothing more than a loan servicer who possessed no funds of its own and had hoped to sell participations in the loan in order to fund it. *Id.* at 150. It took several months after closing for the lender to raise

money to fund the acquisition loan. *Id.* at 151. The permanent take-out loan never closed, forcing the debtor into bankruptcy and, ultimately, to assert its subordination claim. *Id.* at 151–52. Although the lender claimed that the debtor did not meet certain conditions necessary for closing the loan, it was clear to the court that the conditions were either met or waived, and that the true reason for the lender's refusal to close was its inability to sell participations in the loan and raise the necessary capital. *Id.* at 150–52.

First, the court determined that the lender was a fiduciary of the debtor because the broker, who was its agent, also served as the debtor's agent. *Id.* at 154. Therefore, the scrutiny of the *Ambassador* court was necessarily more exacting than is called for in the present situation. In the end, the court subordinated the lender's claim because it represented to several parties, through an apparently independent broker, that the take-out loan was forthcoming long after both the broker and the lender knew that the loan would not be funded. *Id.* at 154–55. In the process, the lender was able to obtain an oversecured position on its initial loan. *Id.* at 154.

Upon comparing the Bank's conduct to the facts of the subordination cases cited above, we cannot conclude that the Bank's decision to effect Congress's withdrawal from the CSE deal was "egregious" or rises to the high level necessary to justify invocation of the extraordinary equitable remedy of subordination of its Claim. First, we note that the most significant of the actions taken which destroyed the sale transaction were taken by Congress, not the Bank itself. It is not clear to us that we can treat both entities as one. For the sake of this discussion, however, we will, on the theory that the Bank controlled Congress. Even so, there has been no allegation that the Bank or Congress mislead the Debtor. Indeed, the Proposal clearly stated that Congress would not be committed to lend until a final commitment letter was executed. No such commitment letter was ever signed by the parties, nor, to our knowledge, did the Bank or Congress make any oral promises which were inconsistent with

the terms stated in the Proposal. We find it illuminating to observe that neither CSE nor the Debtor sued Congress for breach of contract.[6]

Furthermore, there has been no allegation that the Bank or Congress hid their decision not to lend from the Debtor once it was made, nor that they maliciously delayed making that decision.[7] No unsecured creditors were misled by Congress or the Bank into thinking that the loan would be made. Moreover, it is not alleged that either the Bank or Congress caused or contributed to the Debtor's declining business prospects. *Compare Kham & Nate's Shoes, supra,* 908 F.2d at 1358 ("Although Bank's decision left Debtor scratching for other sources of credit, Bank did not create Debtor's need for funds, and it was not contractually obliged to satisfy its customer's desires."). Quite simply put, Congress, at the urging of the Bank, decided not to extend financing to CSE *before* it was obligated to do so. The Debtor may not have liked the reason for Congress's change of heart, and believed that it was made to the detriment of other unsecured creditors, while serving only the Bank's public relations image rather than its status as creditor, but this fact does not give rise to a claim of equitable subordination.

Finally, the Committee has failed to quantify the injury to creditors from the Bank's conduct. It appears that the "pot" available for unsecured creditors was reduced by no more than the difference between the $8.6 million sale price to be paid by CSE and the $7.1 million ultimately paid by AS, *i.e.,* $1.5 million. However, without comparison between the Debtor's total indebtedness as of August, 1992, to that of June, 1993, it is impossible to measure the true effect of the Bank's decision. We do know that the Debtor's Union-member employees, whose interests were purportedly served by the Bank's actions, did retain their jobs for about six more months than they probably would have had the August, 1992, sale to CSE been completed. In light of the balancing of harms from this decision, it is difficult to conclusively determine the injury to creditors or the public at large, if any, which resulted from the Bank's actions.

b. *The Other Allegedly Wrongful Conduct of the Bank Is Insufficient to Justify Equitable Subordination*

Even more obviously than the CSE loan withdrawal situation, the Bank's refusal to consider PCI's bid on the Note does not fit within the paradigm created by the cases cited at pages 230–31 *supra* for application of equitable subordination. To the extent that the Bank's conduct in disposing of the Note was wrongful, this court believes that reducing the Claims by the $750,000 that PCI was prepared to bid would remedy these deficiencies. In the event that the parties can agree to this disposition, there would be no need to subordinate the Bank's Claim because the Claim will be eliminated entirely to the extent of the $750,000 bid. *See* pages 228–30 *supra.*

Finally, harking back to its earlier very weak argument that consideration for the Guaranty was absent, the Committee argues

---

6. Thus, the Committee's argument that all contracts are imbued with the duty to proceed in good faith is irrelevant, because there was no contract in issue which could have been breached. Of course, we do not mean to suggest that the Bank acted in bad faith and is spared only because the parties had not yet entered into a contract. Nor do we necessarily accept the Committee's interpretation of the good faith standard as applied to the facts of this case, even assuming that a contract did exist between the parties. *Cf. Kham & Nate's Shoes, supra,* 908 F.2d at 1357 ("Although courts often refer to the obligation of good faith that exists in every contractual relation, this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document."). We only observe that we need not speculate on this argument in the absence of a signed commitment.

7. We are not unmindful that Congress's late withdrawal of its commitment exacerbated the Debtor's predicament. However, that timing, to a large extent, was caused by forces outside of the Bank's control. We doubt that anyone would have cried "Foul" if the Union had staged their protests earlier in the loan negotiation process, causing Congress to pull out at the outset. It is only natural that the Debtor's expectations became higher as the loan negotiation process progressed. In the absence of misrepresentation or contract breach, however, that fact alone is legally insignificant.

that, even though the Guaranty "may have been supported by bare legal consideration," since the Debtor received so little for the Guaranty, it would be inequitable to allow the Bank to share pro rata with the other unsecured creditors. We disagree. As discussed at pages 225–27 *supra*, we find that the Guaranty was not only supported by adequate consideration, but it was also bargained for by two sophisticated and well-represented business entities. The Debtor's Board of Directors approved the Guaranty, and its lawyers opined to its legitimacy. We fail to see the inequity of this situation. If the Debtor struck a poor bargain, and we believe that it can be concluded that it did so only with 20–20 hindsight in light of the unexpected collapse of both the Debtor's business and the national and local real estate market, we do not see why the Bank should have to give back that for which it bargained as a result.

## D. CONCLUSION

On the basis of the foregoing Discussion, we will enter an Order disposing of most of the issues and proposing that the parties forego the valuation hearing which they previously stipulated would be necessary to finally quantify the Claim. A conference to determine what further proceedings in this contested matter will be necessary is scheduled on January 25, 1995, to which date a motion authorizing distribution of certain of the Debtor's records, continued until after a likely disposition of this matter, has already been rescheduled. We also will schedule a status hearing in the Debtor's main case on that date, which the Debtor's general counsel is required to attend. Since we are now almost two years past the date of the filing of this case, and nearly one year past confirmation, it is our goal to rapidly resolve any outstanding matters and close this case.

### ORDER

AND NOW, this 23rd day of January, 1995, after a two-day trial conducted on November 30, 1994, and December 6, 1994, on the Objection ("the Objection") of the Official Creditors' Committee ("the Committee"), on behalf of the Reorganized Debtor, After Six, Inc. ("the Debtor"), to Proof of Claim No. 320 ("the Claim") Filed by CoreStates Bank,

N.A. ("the Bank"), and upon consideration of the briefs filed by the interested parties in connection therewith, it is hereby OR-DERED AND DECREED as follows:

1. If the parties agree to waive a hearing to determine the fair market value of the Debtor's former place of business located at G Street and Hunting Park Avenue, Philadelphia, Pennsylvania ("the Realty"), the unsecured claim of the Bank shall be reduced from $5,059,772.10 by $750,000 plus the amount which the Bank will actually receive in payment on Claim No. 430, settled for $2,325,450, under the Debtor's plan.

2. All other aspects of the Objection are DENIED.

3. A conference is scheduled at the following date, time, and place to determine whether it will be necessary to conduct a further hearing to ascertain the fair market value of the Realty and what Order should be entered at this time if the parties do not choose to waive the valuation hearing; and also a status hearing shall be conducted in the Debtor's main case, to be attended, *inter alia*, by general counsel for the Debtor in this case, on

WEDNESDAY, JANUARY 25, 1995, AT 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 4 (Room 3620), Third Floor, United States Court House, 601 Market Street, Philadelphia, PA 19106.